Donald RAYNOR, Jr., et al., Plaintiffs,

v.

RICHARDSON–MERRELL, INC., et
al., Defendants.

C.A. No. 83–3506.

United States District Court,
District of Columbia.

Aug. 8, 1986.

Barry J. Nace, Thomas H. Tate, Paulson, Nace & Norwind, Washington, D.C., for plaintiffs.

Mark L. Austrian, Collier, Shannon, Rill & Scott, Washington, D.C., for defendants.

THOMAS F. HOGAN, District Judge.

## MEMORANDUM OPINION

This action is one of a number of similar products liability suits filed against the manufacturers and distributors of Bendectin, a drug marketed to combat nausea in pregnant women. Plaintiff Veronica Griffin ingested the drug during her pregnancy in 1979, and subsequently gave birth to the infant plaintiff Donald Raynor, Jr., who has severely malformed limbs. Plaintiffs allege that Bendectin caused Donald Raynor's birth defects, and have sued Richardson-Merrell, Inc. ("Merrell") for fraud and misrepresentation, breach of implied warranty, breach of express warranty, strict liability in tort, violation of food and drug disclosure laws, and negligence, seeking both compensatory and punitive damages.

Plaintiffs also seek to recover compensatory damages from Standard Drug Co. ("Standard"), who filled Ms. Griffin's prescriptions, for breach of an alleged duty to warn of Bendectin's dangers. In addition, plaintiffs contend that Standard is strictly

liable for selling a defective and unreasonably dangerous drug.

The Court has before it three dispositive motions: (1) defendant Merrell's motion for summary judgment on the issues of fraud and punitive damages; (2) plaintiffs' motion for partial summary judgment on the issue of causation; and (3) Standard's motion to dismiss all claims against it. Upon review of the parties' memoranda and the voluminous supporting exhibits and appendices, the Court concludes that the motions of defendants Standard and Merrell should be granted, and that plaintiffs' motion should be denied.

## I. *Findings of Fact*[1]

### A. *Testing and Marketing of Bendectin*

From 1953 to 1956, Merrell developed Bendectin as an anti-nauseant. Bendectin originally was composed of three drugs already marketed with FDA approval: pyridoxine (Vitamin B6); Doxylamine (an antihistamine Merrell had marketed as "Decaprin" since 1948); and Dicyclomine (an antispasmodic marketed as "Bentyl" since 1950). The drug was proposed by Dr. Raymond C. Pogge in 1953, who urged that clinical studies should be "expedited" to begin marketing by June, 1954, based on past studies of Bendectin's components. Pltf. Opp. App. 2. Merrell did not submit a New Drug Application to the Federal Drug Administration ("FDA") for Bendectin until July 1956. Pltf. App. 3. It was approved by the FDA the same month. The Bendectin tablet allegedly ingested by Ms. Griffin was approved for marketing in July, 1957. Def. Reply Exh. C. In keeping with the FDA's requirements, Merrell did not test Bendectin for possible teratogenicity until 1961, after the Thalidomide disaster became known.

In 1963, Merrell tested Bendectin in rabbits and in rats. Dr. Robert E. Staples, the primary researcher on the rabbit study, concluded that the study did not show that Bendectin is teratogenic in the rabbit. Similarly, the rat study did not reveal teratogenicity. Dr. Staples recommended that further testing at higher dose levels should be done, and his successors at Merrell, Dr. James W. Newberne and Dr. John P. Gibson, conducted such tests in 1966 and 1967 of the individual components of Bendectin. The results of all these tests were published in 1968, in an article authored by Gibson and Staples. Nothing in the record supports plaintiffs' suggestion that the Staples study was improperly constructed, or that Merrell knew of any defects in the experimental design.

Also in 1963, Dr. Carl A. Bunde, Merrell's medical director, published an epidemiological study comparing the pregnancy outcomes of over two thousand women who had ingested Bendectin with those of over two thousand women who bore children at the same time but had not taken Bendectin. This so-called "Bunde-Bowles" study showed no statistically significant difference between the two groups in terms of congenital defects. Merrell was not aware of any data-collection errors in this study, and relied on the results in responding to physicians' requests about the possible teratogenicity of Bendectin, and in advertising and marketing the drug. Although plaintiffs contend that the Bunde-Bowles study was severely discredited by the early 1970s, nothing in the record but their bare allegation supports this position. The position of the study in the academic field after 1979 is not relevant for the purposes of this case.

In 1972, Merrell conducted a cumulative review of all reports received regarding birth defects among the children of Bendectin-using women ("Drug Experience Reports" or "DERs"). The review was done by Dr. Robert A. Stormont, a vice-president of Merrell, and Dr. Bunde. They found that although the total number of birth

---

1. The findings of fact are drawn from defendant Merrell's Statement of Material Facts as to which there is no genuine issue. Plaintiffs did not submit a separate statement, as required by Local Rule 108. Where otherwise indicated, factual findings are drawn from the parties' exhibits and appendices.

defects reported was lower than expected for the number of Bendectin users, the ratio of limb defects in this total was unusually high. They concluded, however, that the reports revealed no pattern of any specific type of limb defect, and attributed the high ratio to other factors: limb defects were more readily apparent at birth; and physicians were more likely to associate drug use with limb defects than with other defects.

Following the receipt of the Stormont-Bunde report, Merrell requested two independent experts to consider whether the DERs gave any inference of Bendectin's possible teratogenicity. Both Dr. James Wilson, Professor of Research Pediatrics and Anatomy at Children's Hospital Medical Center in Cincinnati, Ohio and Dr. Louis B. Salerno, Professor of Obstetrics and Gynecology of New York Medical College reviewed the DERs and the Bunde-Stormont report and agreed that there was no evidence that Bendectin was linked to any increased hazard of congenital defect.

In 1974, at Merrell's request, a private consulting group, Bio-Basics International, Inc., convened a group of independent experts (the "Bendectin Peer Group") to consider the safety and efficacy of Bendectin. The Peer Group reviewed available animal and clinical data concerning Bendectin and concluded "that clinical experience, and a retrospective analysis of clinical data and animal evidence fails to reveal a teratogenic tendency of Bendectin." Def. App. VIII, Tab 12.

In 1975 Merrell tested the two-component Bendectin formulation in rats and rabbits at over ninety times the human dose equivalent. The reports concluded that these tests showed no evidence of teratogenicity.

Studies were also done of Bendectin outside of Merrell in the 1960s and revealed no unusual incidence of birth defects among offspring. There is no evidence that prior to November, 1979 Merrell knew or believed that Bendectin caused birth defects. There is no evidence that Merrell knew or believed that any of the tests it conducted were poorly structured. Further, there is no evidence in the record before the Court at this point that the tests had produced insufficient knowledge of Bendectin's safety to market the drug.

B. *Test Results: Reports to the FDA*

With one exception, all the data discussed above were reported to the FDA upon receipt. The 1963 Staples study was not reported to the FDA until 1966, when Project Report E–66–05 was submitted and the original results (reflected in Project Report E–63–28) were not submitted to the FDA until 1979. The most significant omission this occasioned was the failure to report all observations of alterations such as fixed or clubbed limbs. *See* Def. Reply Ex. I. This data was reviewed by the FDA Fertility and Maternal Health Drugs Advisory Committee at hearings held on Bendectin in 1980. At that time, Dr. James L. Goddard, FDA Commissioner from 1966 to 1968, who would have had the responsibility to withdraw Bendectin from the market, testified that he would not have withdrawn Bendectin even had he been presented with all the data generated in the Staples study.

The Staples study generated several hundred specimens, which were stored in Merrell's laboratory until 1970. Def. Reply Ex. F. At that time, no Bendectin litigation was pending, and specimens from several older studies—including Staples'—were discarded in the consolidation of Merrell's laboratories. Def. Reply Ex. G. The FDA reviewed all of Merrell's available Bendectin data after litigation began, and cited the discarding of specimens as a "procedural deficiency." Def. Reply Ex. I.

C. *Merrell's Participation in Publication of Articles Concerning Bendectin*

In 1957, Dr. Ray Nulsen published an article in the Ohio State Medical Journal concerning Bendectin's efficacy as an antinauseant. The article was based on Dr. Nulsen's research and, at Nulsen's request, Dr. Pogge of Merrell provided assistance in preparing the material for publication.

Pogge has previously testified that this was routine practice when information received from clinical investigations was sufficient to justify publication. Def. Reply Ex. D, E. There is no indication in the evidence of record that the data or conclusions reflected in the article were not Dr. Nulsen's own or that the data were inaccurate or distorted. No other independent articles appear to have been linked to Merrell's staff.

### D. Merrell's Representations to Doctors

In 1964, Merrell's Bendectin marketing campaign included the mailing of reprints of the Bunde-Bowles study to 30,000 physicians. Pltf. App. 16. In addition, in a 1965 letter to Dr. Robert B. Jensen, one of Merrell's detail men, Merrell's counsel Frederic Lamb stated that (1) Bendectin's warnings complied with FDA requirements, (2) the Bunde-Bowles study, which accompanied the detail card, established that "there was no statistically significant difference between the incidence of malformations" in children of control and of Bendectin-treated women, and (3) that he knew of no information indicating that Bendectin was teratogenic. Pltf. App. 18. This information apparently was to be communicated to physicians.

### E. The Role of Standard Drug

Ms. Griffin was prescribed Bendectin, and had the prescription filled by Standard Drug Co., Inc. ("Standard"), a pharmacy in the District of Columbia. Complaint ¶¶ 2–3, 71. Plaintiffs seek to recover against Standard based on Standard's failure to advise Ms. Griffin of Bendectin's therapeutic values and adverse effects, and on Standard's failure to warn Ms. Griffin that Bendectin's antihistamine ingredient was a proven teratogen and that the FDA required warnings against the use in pregnancy of all non-prescription antihistamines. Complaint ¶¶ 71–72. Plaintiffs also allege that Standard is strictly liable for the injuries caused by Bendectin, allegedly a defective and unreasonably dangerous

drug. Complaint ¶¶ 79, 82. In 1979, no District of Columbia statute defined the duties of a pharmacy in the dispensation of prescription medicines. Plaintiffs have not alleged that Standard failed to fill Ms. Griffin's Bendectin prescription properly.

### F. Prior Bendectin Litigation

Plaintiffs have moved for summary judgment on the issue of whether Bendectin caused Donald Raynor, Jr.'s birth defects, based on collateral estoppel. The issue of Bendectin's causative role in congenital limb defects has been litigated before. In *Mekdeci v. Merrell-National Laboratories*, Case No. 77–255–Orl-Civ-Y, the jury returned a verdict on April 9, 1981 in favor of defendants on plaintiff's claims of negligence, strict liability, and breach of express and implied warranties. Def. Opp., Austrian Aff. Ex. C. The judgment was affirmed on appeal. *Mekdeci v. Merrell-National Laboratories*, 711 F.2d 1510 (11th Cir.1983).

In 1983, the jury in *Oxendine v. Merrell-Dow Pharmaceuticals, Inc.*, D.C. Superior Court Civil Action No. 1245–82, returned a verdict in favor of plaintiffs. On September 1, 1983 Judge Hannon granted defendants' motion for judgment n.o.v., reasoning that plaintiffs had failed to prove that Bendectin proximately caused the infant plaintiff's defects. Def. Opp., Austrian Aff. Ex. J. The D.C. Court of Appeals reversed on March 25, 1986, and ordered reinstatement of the jury verdict. *Oxendine v. Merrell-Dow Pharmaceuticals, Inc.*, 506 A.2d 1100 (D.C.App.1986).

In March, 1985 the trial in *In re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation*, involving more than 800 consolidated lawsuits brought by over 1,100 plaintiff children, ended in a unanimous jury verdict in favor of Merrell on the issue of causation. Def. Opp., Austrian Aff. Ex. I.

In the most recent Bendectin cases to come to trial, *Will v. Richardson-Merrell, Inc.*, No. 484–119 (S.D. Ga. June 25, 1986), and *Cordova v. Richardson-Merrell, Inc.*, Santa Clara, California Superior Court

Case No. 432856, jury verdicts were returned in defendants' favor. Def. Opp. Austrian Aff. Ex. G.; Supp. Mem. in Opposition, July 3, 1986. Plaintiffs' motion for judgment n.o.v. or new trial was denied. *Id.* In addition to the above cases, there are eight suits pending against Merrell in this District, not including this action. At the time of this opinion, trial has just begun in *Richardson v. Richardson-Merrell, Inc.*, No. 83-3505 (D.D.C.) before the Honorable Thomas Penfield Jackson. None of the remaining cases has come to trial or been otherwise disposed of. Designated by plaintiffs' name only, they are *Ambrosini*, C.A. No. 84-3483; *Ealy*, C.A. No. 83-3504; *Herring*, C.A. No. 83-0399; *Jackson*, C.A. No. 85-1972; *Taylor*, C.A. No. 84-1168; *Koller*, C.A. No. 80-1258; and *Whelan*, C.A. No. 83-3108.

## II. *Conclusions of Law*

### A. *Merrell's Motion For Summary Judgment on Fraud and Punitive Damages Claims*

Summary judgment is appropriate when there are no genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed.R. Civ. P. 56(c). The Supreme Court recently clarified the role of summary judgment in litigation, stating:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, — U.S. —, —, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, courts must approach summary judgment motions with an even hand, evaluating all concrete evidence provided, and drawing all inferences in favor of the party opposing the motion. The non-movant bears no extraordinary burden: he must merely show that he has sufficient evidence to establish all essential elements of his case, on which he will bear the burden of proof at trial. *Id.*

The court's inquiry therefore is directed to the existence of genuine issues of material fact. Substantive law determines which facts are "material" for each of plaintiffs' claims. *E.g., Anderson v. Liberty Lobby, Inc.*, — U.S. —, —, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A "genuine issue" exists as to such a fact if "the evidence presented is such that a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* — U.S. at —, 106 S.Ct. at 2513–14. Thus, the Court must first discern the material facts for plaintiffs' claims, and then determine whether any genuine issues remain as to those facts.

### 1. *Fraud Claim*

■ The elements of common-law fraud in the District of Columbia are (1) a false representation (2) involving a material fact (3) made with knowledge of its falsity (4) made with intent to deceive and (5) action taken in justifiable reliance thereon. *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. App.1977). The first element may be satisfied by active misrepresentation, nondisclosure or silence. *Id.* Plaintiffs must prove the existence of fraud by clear and convincing evidence, and evidence that is "equally consistent with either honesty or deceit" will not meet this stringent standard. *Id.* at 69. The four bases of plaintiffs' fraud claim shall be treated separately.

■ First, plaintiffs contend that Merrell promoted and marketed Bendectin even though they either had knowledge it was a teratogen or lacked sufficient knowledge of the drug's safety. Complaint ¶ 15. Plaintiffs have not produced evidence that Merrell had knowledge that Bendectin was a teratogen. Indeed, Bendectin's teratogenicity continues to be disputed in the scientific community. Merrell did have knowledge of Bendectin's "possible teratogenicity," but plaintiffs produced no evidence indicating that Merrell misrepresented or

ignored this evidence in its testing, promotion and marketing of the drug. The quarrel plaintiffs have with various reports and test results does not rise to clear and convincing evidence that the necessary elements of knowledge or false representation exist.

Second, plaintiffs' claim that Merrell caused false and misleading articles and advertisements to be printed is not supported by clear and convincing evidence. In connection with this claim, plaintiffs point to only one article, published by Dr. Nulsen. They apparently contend that Merrell, by not appearing in the Journal as co-author of the article, falsely represented by its silence that the article was written by an independent, unaffiliated researcher. Even if this evidence rises to a "false representation" under the law, plaintiffs have provided no evidence that the authorship of this article was material to Ms. Griffin's decision to use Bendectin or that anyone—including the plaintiffs or Ms. Griffin's physician—justifiably relied on such a "statement."

Further, plaintiffs claim that Merrell deceived doctors who inquired about Bendectin's safety. Principally, plaintiffs point to the Bunde-Bowles study, which was published in a medical journal, direct-mailed to physicians, and present on Bendectin's detail card used to market Bendectin to physicians. Plaintiffs do not contend that the data yielded in the study were false, or that Merrell ever inaccurately reported the results of the study. They further do not deny that the Bunde-Bowles study was the only study during the 1960s and 1970s of its scope. In support of this theory, plaintiffs also rely on Lamb's letter to Dr. Jensen. No false statement was made therein, and the Court cannot draw any inference of fraud therefrom. Even were the Court able to do so, there is no evidence that Ms. Griffin's physician relied on the letter when prescribing Bendectin. Plaintiffs' challenges to the use of the Bunde-Bowles study to market Bendectin, including Lamb's letter to Jensen, do not rise to clear and convincing evidence of fraudulent misrepresentations.

Finally, plaintiffs claim that Merrell fraudulently reported or concealed Bendectin test data from the FDA. No misrepresentations appear in the data Merrell reported to the FDA, and all data on Bendectin was provided to the FDA prior to 1979. The single exception was data from the Staples study. The FDA Commissioner for the time period when data was allegedly concealed (i.e., when it was generated in 1963, and when Project Report E–66–05 was submitted in 1966), testified that Bendectin would have remained on the market as a pregnancy antinauseant even if the additional Staples data had been submitted. Plaintiffs have produced no evidence to rebut this statement, and any contention that other FDA action might have been forthcoming (i.e., use restrictions or warnings) is simply too speculative to meet the standard of clear and convincing evidence. Further, since all the data was provided to the FDA by the time Ms. Griffin was prescribed Bendectin, any inference of causation would at best be tenuous and speculative.

Plaintiffs have had ample opportunity to conduct discovery, and have been unable to oppose the motion for summary judgment with anything but unsupported allegations and innuendos. They nonetheless suggest that since the complex factual nature of product liability cases often precludes the grant of summary judgment defendants' motion should be denied. *E.g., Gracyalny v. Westinghouse Electric Corporation,* 723 F.2d 1311, 1316–17 (7th Cir.1983) (reversing summary judgment in product liability case because of numerous unresolved issues concerning the reasonableness and adequacy of the defendant manufacturer's warnings). However, the issue before the Court on this motion is one of fraud, and the mere fact that it is presented in conjunction with a product liability claim is not enough to bar summary judgment. The facts needed to support plaintiffs' fraud claim are more easily proved than general negligence questions of reasonableness of conduct, foreseeability and proximate cause. A "policy" favoring jury trials in tort cases cannot overcome a motion for

summary judgment when plaintiffs have presented no facts of sufficient degree of legal probative force to create a genuine dispute. *Cf. Hughes v. American Jawa, Ltd.*, 529 F.2d 21, 25–26 (8th Cir.1976) (expert's deposition testimony raised factual question on issue of causation, making summary judgment inappropriate; court emphasized "policy favoring plenary trials" in tort cases). Indeed, in light of the even-handed approach to summary judgment the Supreme Court has mandated in *Celotex Corporation*, —— U.S. at ——, 106 S.Ct. at 2555, it is questionable whether courts may continue to conduct a policy-oriented resolution of summary judgment motions. Rather, summary judgment is given significant procedural strength, and is raised as a bulwark against claims based on speculation and inference.

Litigants are provided a panoply of pretrial procedures, intended to uncover evidence and streamline the presentation of a case to the jury. Summary judgment is a necessary complement to the liberal rules of pleading and discovery available in federal court. Having had the benefit of full discovery as well as the trial testimony of many key participants in earlier trials, plaintiffs cannot now fall back on policy to oppose defendants' summary judgment motion on the issue of fraud. Viewing the evidence in the record on the issue of fraud through the "prism" of the clear-and-convincing evidentiary standard, it is apparent that there are no genuine issues of material fact, and Merrell is entitled to judgment as a matter of law.

### 2. *Punitive Damages Claim*

■■■ Punitive damage awards are disfavored under District of Columbia law, and to merit their grant the conduct complained of must be "willful and outrageous, constitute gross fraud, or be aggravated by evil motive, active malice, deliberate violence or oppression." *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Systems, Inc.*, 665 F.2d 1066, 1071 (D.C.Cir.1981) (applying District of Columbia law). Wanton and reckless disregard for the rights of others will support an award of punitive damages, but gross negligence will not suffice. *E.g., Knippen v. Ford Motor Company*, 546 F.2d 993, 1002–1003 (D.C.Cir.1976). Punitive damages are awarded to punish and deter outrageous conduct, and the question in this case is whether defendant Merrell's conduct "contains elements of intentional wrongdoing or conscious disregard" for plaintiffs' rights. *Id.*, at 1002; *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 549–50 (D.C.Cir.1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). The elements justifying punitive damages must be "clearly established." *E.g., Darrin v. Capital Transit Co.*, 90 A.2d 823, 825 (D.C.Mun.App. 1952). In the context of product liability actions, this burden has been equated with the clear and convincing standard of proof. *See, e.g., Acosta v. Honda Motor Co., Ltd.*, 717 F.2d 828, 839 (3d Cir.1983) (discussing punitive damages in strict liability context, applying Virgin Islands law); *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 850–51 (2d Cir.1967) (applying New York law). Viewing the evidence of record, it does not appear to the Court that even a preponderance of the evidence proffered by plaintiffs demonstrates that Merrell's conduct was "outrageous" or otherwise of such a character to permit imposition of punitive damages. The evidence certainly does not rise to the "clear and convincing" standard recognized as appropriate in similar actions. Since plaintiffs have failed to present sufficient evidence from which punitive damages could be awarded, their claim must be dismissed. *Accord Koller*, C.A. No. 80–1258, slip op. (D.D.C. February 24, 1983) (granting summary judgment on fraud and punitive damages); *Mekdeci*, C.A. No. 77–225–Orl.-Civ-Y (M.D. Fla. January 21, 1981) (same). *Contra Richardson*, C.A. No. 83–3505, slip op. (D.D.C. June 9, 1986) (summary judgment on fraud and punitive damages denied without prejudice); *Oxendine*, C.A. No. 1245–82, slip op. (D.C.Super.Ct. April 29, 1983) (same); *Cordova*, C.A. No. 432856 (Cal.Sup.Ct.) (same).

### B. *Plaintiff's Motion for Summary Judgment on Causation Issue*

■ Plaintiffs look to the reinstated jury verdict against Merrell in the *Oxendine* trial in support of their claim that collateral estoppel should preclude Merrell from litigating causation in this case. While "offensive" collateral estoppel is permitted, the Supreme Court has stated that it should not be allowed when its application would be unfair to the defendant. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). In particular, offensive collateral estoppel would likely be unfair to a particular defendant if there are inconsistent previous decisions. *Id.* This Circuit reached such a conclusion in *Jack Faucett Associates v. A T & T,* 744 F.2d 118, 131 (D.C. Cir.1984), noting that it was an abuse of discretion for the lower court to have used one decision as the basis for offensive estoppel while ignoring other decisions. Plaintiffs are asking the Court to don blinders in considering their motion. Faced with the inconsistent verdicts against Merrell on the issue of causation in Bendectin product liability cases, offensive collateral estoppel is not appropriate. Plaintiffs' motion for summary judgment should be denied.

### C. *Standard's Motion to Dismiss*

Plaintiffs contend that Standard, when it filled Ms. Griffin's physician's presciption, negligently breached its independent duty to advise and warn her of the risks of Bendectin. They also contend that Bendectin was an unreasonably unsafe, defective product and that Standard is strictly liable for the injuries they claim. Standard has moved to dismiss both claims.

■ No District of Columbia court has ruled whether pharmacies have a common-law duty to warn customers of the risks associated with the prescription drugs they purchase. Under Maryland law, to which this Court turns for guidance, such a duty has been specifically rejected, for sound policy and legal considerations. *E.g., Johnson v. Richardson-Merrell,* No. B–83–3814, slip op. at 5 (D.Md. June 1, 1984). In *Johnson,* as here, relief was sought for injuries allegedly caused by Bendectin. Ms. Johnson's doctor had prescribed the drug, and the defendant pharmacy filled the prescription correctly. *Id.* at 4. There, as here, there was

> no allegation that the pharmacy did any compounding or changed the drug in any way after receiving it from the manufacturer, nor [was] there an allegation that the pharmacy substituted a different brand or a generic version for the brand prescribed, Bendectin. There is therefore no showing that the pharmacy exercised any independent discretion, skill or knowledge, in filling the prescription.

The court was unwilling to. impose a duty to warn on pharmacies, reasoning that such a duty would, in effect, require a pharmacy to substitute its judgment for that of the prescribing physician. *Id.* at 3–4. Plaintiffs have not cited a single case imposing a like duty on pharmacies. The reliance they place on D.C.Code § 2–2002 is misplaced.[2] That section of the Code was not enacted at the time Standard filled Ms. Griffin's presciption, and there was no analogous provision in effect. The Court makes no determination whether § 2–2002 imposes an actionable duty on pharmacies. Thus, even assuming for the purpose of this motion

---

**2.** D.C. Code § 2–2002 provides in pertinent part:
(13) The term "practice of pharmacy" means the interpretation and evaluation of prescription orders; the compounding, dispensing, and labeling of drugs and devices, and the maintenance of proper records therefor; the responsibility for advising, where regulated or otherwise necessary, of therapeutic values and content, hazards and use of drugs and devices; and the offering or performing of those acts, services, operations, and trans-

actions necessary in the conduct, operation, management, and control of a pharmacy. This section serves to define conduct in which individuals may only engage in the District of Columbia if they hold a valid license. *See* D.C. Code § 2–2003. Similar definitional language was held insufficient under Maryland law to impose a duty on pharmacists to advise individuals of the effects of drugs they dispense. *Johnson,* slip op. at 5.

that Standard knew Bendectin was teratogenic, it had no duty to warn Ms. Griffin.

 As a result, plaintiffs' strict liability claim fares little better. The District of Columbia has adopted the strict liability position of § 402A of the Restatement (Second) of Torts, which makes a seller liable for marketing a defective, unreasonably dangerous product. *See e.g., Berman v. Watergate West, Inc.,* 391 A.2d 1351 (D.C. App.1978); *Cottom v. McGuire Funeral Service, Inc.,* 262 A.2d 807 (D.C.App.1970). Comment k makes an exception to the strict liability rule for products such as drugs, which are unavoidably unsafe due to risks associated with and inherent in their use. If a drug is accompanied by adequate warnings of the risks involved, it is neither "defective" nor "unreasonably unsafe" under § 402A. As one court has noted, "[i]n this respect, comment k simply adopts the ordinary negligence concept of duty to warn." *Basko v. Sterling Drug, Inc.,* 416 F.2d 417, 426 (2d Cir.1969). Pharmacies in the District of Columbia do not have any common law duty to warn when they merely dispense a prescription drug, and the limited liability available under § 402A, Comment k could not attach.

Even if some residual duty were to be found, the District of Columbia has already recognized that the "adequacy" of a warning under § 402A is affected by the manner in which a product is distributed. *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 722–23 (D.C.App.1985) (adequacy of warnings accompanying permanent hair wave solution that was to be distributed only through licensed beauticians). In *Payne,* the court held that when "advertising did not induce purchase of the product, but the purchase was recommended by an intermediary who is a professional, the adequacy of the [warnings] must be judged in relationship to that professional." *Id.* at 722 n. 10. This is consistent with comment c's justification for strict liability: the public's forced reliance upon a seller who markets products for consumer use. § 402A, Restatement (Second) of Torts, Comment c. As construed by the courts, a patient relies upon her physician not her pharmacy to warn her of risks associated with prescription drugs. Thus, since in the District of Columbia a pharmacy plays no role in establishing the narrow scope of strict liability under § 402A, comment k, it cannot be held liable under plaintiffs' second theory. Plaintiffs' claims against Standard must therefore be dismissed. An order consistent with the above conclusions accompanies this opinion.