William R. DYER, Appellant/Cross–Appellee,

v.

WILLIAM S. BERGMAN & AS-SOCIATES, INC., Appel-lee/Cross–Appellant.

Nos. 93–CV–783, 93–CV–890 and 93–CV–1054.

District of Columbia Court of Appeals.

Argued Sept. 22, 1994.

Decided April 20, 1995.

**1134**

Jonathan A. Constine, with whom Clifford D. Stromberg, Washington, DC, was on the brief, for appellant/cross-appellee.

Douglas E. Fierberg, Washington, DC, for appellee/cross-appellant.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

A jury awarded William S. Bergman & Associates, Inc. (WSBA) $20,625 in compensatory damages and $82,500 in punitive damages against William R. Dyer for tortious interference with contractual relations. The judge subsequently awarded WSBA $42,-779.28 in counsel fees. On appeal, Dyer contends that the evidence was insufficient to support a finding that he intentionally interfered with WSBA's contractual rights. He also asserts that the trial court should have set aside the award of punitive damages because, according to Dyer, his conduct was not sufficiently outrageous, because the proof did not meet a "clear and convincing" standard, and because, as a result of the granting of his

motion for a remittitur, there remained no effective award of compensatory damages. Finally, he claims that the judge abused his discretion in awarding WSBA counsel fees.

WSBA cross-appeals, contending that the judge erroneously granted Dyer's motion for a remittitur. WSBA claims that, although it recovered $27,795.02 in an arbitration proceeding against the company which Dyer was found to have induced not to honor its contract with WSBA, no double recovery was involved because, according to WSBA, the arbitration award and the jury award covered different losses.

We affirm the judgment in all respects.

## I.

### THE TRIAL COURT PROCEEDINGS

In its complaint, which was filed on November 27, 1989, WSBA alleged that Dyer, who was one of its former officers, breached his employment agreement, violated fiduciary obligations to WSBA, tortiously interfered with WSBA's contractual and business relationship with its client, National Structured Settlements Trade Association (NSSTA), and unlawfully appropriated documents and records from WSBA's offices so that he could divert NSSTA's business to himself. Dyer denied WSBA's allegations of wrongful conduct and counterclaimed for unpaid vacation and sick leave.

The jury trial in this case began on June 18, 1991. After the close of WSBA's case, Dyer moved for a directed verdict on all counts. The trial judge denied the motion as to WSBA's claims of breach of contract and tortious interference with a contractual relationship, but granted the motion with respect to WSBA's claim of breach of fiduciary duty, holding that such a breach does not give rise to an independent cause of action.[1]

On June 21, 1991, the jury found in favor of WSBA on its breach of contract and tortious interference claims, awarding WSBA $20,625 in compensatory damages on the tort claim and $82,500 in punitive damages. The

1. At the close of all of the evidence, Dyer renewed his motion for directed verdict on WSBA's breach of contract and tortious interfer- ence claims. The judge denied the renewed motion.

jury awarded no damages on the breach of contract claim. Dyer filed a timely post-trial motion for judgment notwithstanding the verdict (n.o.v.) or, in the alternative, for a new trial. The court denied the motion.

WSBA had previously instituted a separate arbitration proceeding to recover damages suffered by WSBA as a result of NSSTA's breach of its contract with WSBA. The arbitrator ruled in WSBA's favor, and WSBA collected damages from NSSTA in the amount of $27,795.02. Contending that WSBA could not recover damages both for the breach of a contract and for tortious interference with the same contract, Dyer moved the court for a remittitur equal to the amount of the arbitration award. The judge initially granted a remittitur of $27,795.02 (the amount of the arbitration award). In a written order dated June 9, 1993, however, the judge granted in part WSBA's motion for reconsideration pursuant to Super.Ct.Civ.R. 59(e) and held that the arbitration award should be credited only against the jury's award of compensatory damages, but not against the award of punitive damages. He therefore reduced the amount of the remittitur to $20,625.00. On July 9, 1993, Judge Dixon entered a final order which incorporated the jury's verdict and all post-trial rulings.

Prior to the judge's resolution of WSBA's motion for reconsideration, Dyer filed an appeal from the judgment and from the denial of his motion for judgment n.o.v. Because the Rule 59(e) motion was still pending, the appeal was dismissed as premature. *Dyer v. William S. Bergman & Assocs., Inc.,* 635 A.2d 1285 (D.C.1993) (*Dyer I*). Now before us are Dyer's timely appeal and WSBA's cross-appeal.

## II.

## THE FACTS

The evidence at trial, viewed in the light most favorable to WSBA, *see Etheredge v. District of Columbia,* 635 A.2d 908, 915–16 (D.C.1993), revealed that WSBA is a trade association management firm operating in the District of Columbia. William S. Bergman is its president.

From 1976 until October 27, 1989, Dyer was an employee of WSBA and worked as an account executive. He also served as a director and vice-president for marketing, and he owned 10% of WSBA's stock. Like all of WSBA's employees, Dyer covenanted in his written employment agreement not to solicit or accept employment with any of WSBA's clients for one year after his employment terminated.

During the last two years of his employment at WSBA, at NSSTA's explicit request, Dyer had been designated to serve as the account executive for NSSTA, which was one of WSBA's principal clients. He also became an Executive Vice President of NSSTA. Although NSSTA was "very adamant about Randy Dyer being the person that we wanted," WSBA retained the right under the agreement to replace him as account executive. The initial term of NSSTA's contract was from March 25, 1987 to January 14, 1988, but the agreement was renewed for two additional years through January 14, 1990.

In late August 1989, the directors of WSBA met to discuss a financial crisis which had beset the company. It was disclosed that the business was insolvent and struggling to pay rent and taxes and to meet its payroll. Dyer asked Bergman to permit him to leave the company and to "buy out" the NSSTA account. Bergman declined Dyer's request.

On September 7, 1989, Dyer met with NSSTA's board of directors. John Macker, the former president of NSSTA, testified that Dyer told the board of his offer to buy out the NSSTA account. According to Macker, the board knew that "something was going on at Bergman's" and that "WSBA was insolvent and having financial problems." Bergman testified that only three persons— he, Dyer, and another employee of WSBA— knew of the firm's precarious financial position at this time. Although there was no testimony that Dyer urged NSSTA to terminate its agreement with WSBA, NSSTA's board went into executive session immediately after the meeting, and "rushed out very quickly" a letter advising WSBA that its

contract would not be renewed after January 14, 1990.[2]

After receiving NSSTA's September 7, 1989 termination letter, WSBA assured NSSTA that it was ready, willing and able to carry out its remaining contractual obligations up to and including January 14, 1990, and hoped to continue to serve NSSTA thereafter. NSSTA advised WSBA that WSBA could bid for the contract for the following year.

During September 1989, Dyer secretly established his own trade association management company, Trade Association & Society Consultants, Inc. (TASC). He directed his assistant at WSBA to remove from WSBA's offices certain historical information and correspondence which, according to the testimony, WSBA needed in order to continue to service NSSTA's account. This information (some or all of it) was sent to NSSTA's president. Bergman received no notice of this activity, nor did he consent to it. Bergman testified that the secret removal of documents was not a "common practice in the business" but, on the contrary, was "unheard of." On September 29, without advising Bergman, Dyer incorporated TASC, a potential competitor of WSBA for the NSSTA account.

On October 2, 1989, WSBA gave Dyer notice that his employment with the company would be terminated for the stated reason that WSBA could no longer afford his services if the NSSTA contract was not going to be renewed. Macker testified that during October he and Dyer had conversations about Dyer taking over the NSSTA contract personally after January 14, 1990 and, some time during that October, Dyer gave him a proposal to this effect. On October 27, 1989, Dyer's last day with WSBA, NSSTA sent WSBA notice by hand that it was terminat-

ing its contract with WSBA and that it would make no additional payments on the contract. Also on that day, Dyer removed from WSBA's offices various additional materials relating to NSSTA's account, including membership rosters, legislative reports, and political action committee files. Bergman testified that he saw Dyer with some of these files and specifically instructed him to leave them in WSBA's offices. According to Bergman, Dyer promised to do so. There was testimony, however, that Dyer nevertheless secretly entered WSBA's offices after hours and transported the files to a temporary office which he had established next door to Macker's place of business.[3] Dyer also had the telephone lines which had been used for the NSSTA account transferred from WSBA to his new office. Through his new company, Dyer began servicing the NSSTA account on the first business day following his departure from WSBA.

### III.

### LEGAL DISCUSSION

*A. The Standard of Review.*

In determining whether the trial court erred in denying Dyer's motions for a directed verdict and for judgment n.o.v., we view the evidence in the light most favorable to the plaintiff. *Etheredge, supra,* 635 A.2d at 915. Every reasonable inference from the evidence must likewise be drawn in WSBA's favor, and "[i]t is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly [direct a verdict or] grant judgment notwithstanding the verdict." *Id.* It is the responsibility of the jury, and not the judge, to weigh the evidence and to pass on

**2.** Under the agreement between NSSTA and WSBA, the contract was automatically renewed on the anniversary date for an additional year unless written notice of termination was served by one party upon the other at least one hundred twenty days prior to the expiration of the annual period. Thus, the September 7 notice of nonrenewal as of January 14, 1990, unlike the subse-

quent notice of immediate termination dated October 27, 1989, was not a breach of contract.

**3.** Dyer testified that he removed only personal documents. He was, however, impeached with testimony which he had given at an earlier hearing in which he acknowledged, in response to questions posed to him by the court, that some of the removed documents related to NSSTA and

the credibility of witnesses. *Id.* at 916.[4]

### B. Compensatory Damages.

 Dyer contends that the evidence was insufficient as a matter of law to support a finding of intentional interference with contractual relations.[5] We conclude, to the contrary, that the evidence was sufficient, under the applicable standard of review, to support a finding that Dyer induced the breach and that he did so intentionally. To be sure, there was no direct testimony that he urged NSSTA to take this action. In order to find tortious interference, the jury had to infer from all of the circumstances that, by his words or conduct, Dyer procured NSSTA's repudiation of the WSBA contract and that he did so intentionally.

 As we observed in *Janifer v. Jandebeur,* 551 A.2d 1351 (D.C.1989), "circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." *Id.* at 1352 (citations omitted). NSSTA's decision not to renew WSBA's contract occurred on Labor Day, immediately after Dyer's meeting with the NSSTA directors in which—the jury could reasonably infer—he advised them of WSBA's financial travails and of his unsuccessful attempt to secure the account. Moreover, an impartial jury could reasonably find from Dyer's subsequent activities that he played a role not only in this decision not to renew but also in NSSTA's decision reflected in the October 27 letter to terminate the contract at once. As indicated, there was

evidence that in September Dyer caused his assistant to send account documents to NSSTA without Bergman's knowledge and in a fashion which Bergman described as "unheard of" in the business. Dyer also met with Macker of NSSTA during October and made a proposal to take over the NSSTA account personally. While Dyer insists on appeal that this proposal related only to the post-January 14 period when the contract would have expired, the jury could also fairly consider it as evidence of Dyer's readiness—communicated to NSSTA—to assume the contract earlier should NSSTA find a reason to terminate.

On October 27, 1989, Dyer's last day at WSBA, and again on the following day, Dyer surreptitiously spirited from WSBA's office further important materials relating to NSSTA. Bergman testified that Dyer took some of those documents after assuring Bergman that he would not do so. As a result, TASC was ready to service NSSTA's account the following week and to supplant WSBA, Dyer's former employer.

Dyer argues that the removal of documents is irrelevant because it occurred after the alleged breach. He maintains that NSSTA terminated WSBA after WSBA dismissed Dyer on October 2, and that the termination occurred because, at all relevant times, NSSTA had wanted Dyer as its account executive. This is certainly one view of the evidence, and Dyer would not have

had been developed while he was employed at WSBA.

**4.** The standard of review with respect to points not preserved in the trial court and raised for the first time on appeal is addressed in our consideration of compensatory damages.

**5.** Dyer contends preliminarily that his statements at the September 7, 1989 meeting with NSSTA personnel were true, and that WSBA's suit could not properly be predicated upon true statements. Dyer never made this argument in the trial court, and he has therefore waived it. *District of Columbia v. Banks,* 646 A.2d 972, 977–79 (D.C. 1994). If Dyer had preserved the issue, the "truthful statement" theory would have some appeal:

It seems probable ... that the mere statement of existing facts, or assembling of information

in such a way that the party persuaded recognizes it as a reason for breaking the contract, is not enough so long as the defendant creates no added reason and exerts no other influence or pressure by his conduct.

W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS, § 129, at 990 (5th ed. 1984) (footnote omitted); *accord, International City Mgmt. Ass'n Retirement Corp. v. Watkins,* 726 F.Supp. 1, 6 (D.D.C.1989) (citing RESTATEMENT (SECOND) OF TORTS, § 772 comt. b). As WSBA notes in its brief, however, Dyer never asked for a jury instruction on the point he now seeks to press, never objected to the omission from the judge's charge of the "truthful statement" defense, and never raised the issue at all in the trial court or even in his first appeal. Given the overall pattern of Dyer's conduct, we cannot conclude that the judge's failure to rule in Dyer's favor, *sua sponte,* on a theory which was never brought to his attention, resulted in a miscarriage of justice.

been held liable if the jury had elected to credit it.

■ There was evidence, however, that the removal of documents by Dyer's assistant began well before Dyer's dismissal. Dyer's alleged motive for inducing NSSTA to discontinue its relationship with WSBA—*i.e.* to secure NSSTA's business for himself and his own company—likewise existed both while Dyer was employed by WSBA and thereafter.[6] Viewed in the light most favorable to WSBA, the evidence supported a finding that Dyer's activities over a period of two months were part of a single course of conduct designed to induce a breach by NSSTA and to avail himself of the fruits of that breach.

Moreover, if credited, the evidence of Dyer's unauthorized removal of documents and of his broken promise not to remove them could fairly be viewed by the trier of fact as dishonest and dishonorable. An impartial jury could reasonably draw from such conduct an unfavorable inference against Dyer; moreover, such an inference "[operates] indefinitely though strongly against the whole mass of alleged facts constituting [Dyer's] cause." *Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991) (quoting II J. WIGMORE, EVIDENCE, § 278, at 133 (Chadbourn ed.1979)).[7] Although the proof of

wrongful inducement was not overwhelming, we conclude that the circumstantial evidence was sufficient to warrant submission of the case to the jury. Accordingly, the trial judge properly denied Dyer's motions for a directed verdict and for judgment n.o.v.

### C. *Punitive Damages.*

Dyer asks us to set aside the award of punitive damages on several grounds. None of his contentions persuades us that reversal is appropriate.

■■■ First, Dyer asserts that his actions were not sufficiently outrageous to support the imposition of punitive damages. The trial judge commented that "if there were ever a case that was appropriate for punitive damages, this case is one of those cases." The jury could reasonably find that Dyer, an officer and director of WSBA, betrayed his trust[8] by misappropriating WSBA's records and, ultimately, by wrongfully stealing one of its principal clients.[9] Viewed in the light most favorable to WSBA, the evidence against Dyer was sufficient to support a finding by an impartial trier of fact that Dyer's acts "were malicious and in willful, wanton, or [in] reckless disregard of [WSBA]'s rights,"—the standard for punitive

---

6. "Motive is evidence of the commission of any crime," *see, e.g., Martin v. United States*, 606 A.2d 120, 128 (D.C.1991) (citations omitted), and must likewise be evidence of the commission of an intentional tort.

7. An impartial jury could reasonably view Dyer's trial testimony that he removed only personal documents, *see* note 3, *supra*, and the subsequent impeachment of Dyer with his earlier testimony, as further buttressing this unfavorable inference.

8. We note that this betrayal of trust may have had its genesis in Dyer's potentially conflicting obligations to WSBA and NSSTA. Being an officer in both companies, he had a fiduciary relationship to each. When WSBA's financial condition deteriorated, the interests of the two companies became antagonistic with respect, *inter alia*, to the desirability of disclosure to NSSTA of WSBA's plight. To disclose could potentially further injure WSBA's business; not to disclose could place NSSTA's interests at risk. This case illustrates the wisdom of the maxim that a man cannot serve two masters, for one who attempts to act for both sides is "confronted with the impossible task of securing for each the most advantageous bargain possible." *Urban Invs.,*

*Inc. v. Branham*, 464 A.2d 93, 96 (D.C.1983) (quoting 12 AM JUR.2d § 87, at 841).

9. Dyer contends, as we have noted, that the misappropriation of records occurred after NSSTA's breach of its contract and could not have induced it, and this is correct at least in part. Dyer's resort to such conduct after the breach, however, sheds some light on his state of mind at relevant times prior to the breach, and it is on that state of mind that the punitive damage inquiry must focus. Here, as in *In re Shillaire*, 549 A.2d 336, 345 (D.C.1988), the later events

"tend reasonably to show the purpose and character of the particular transactions under scrutiny." *FTC v. Cement Institute*, 333 U.S. 683, 705, 68 S.Ct. 793, 805, 92 L.Ed. 1010 (1948). "Events obscure, ambiguous or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive and informative when considered in relation to other action." *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 826 n. 6, 4 L.Ed.2d 832 (1960). *See also Clark v. United States*, 593 A.2d 186, 195 (D.C.1991).

damages regarding which the judge, without objection, instructed the jury.[10]

■ Second, Dyer contends that WSBA did not prove by clear and convincing evidence that it was entitled to punitive damages. This court has never specifically determined whether the facts on which a plaintiff's claim for punitive damages is based must be proved by a preponderance of the evidence—the conventional civil standard—or by a more exacting measure of proof. *See Darrin v. Capital Transit Co.*, 90 A.2d 823, 825 (D.C.1952) (underlying conduct must be "clearly established"); *De Foe v. Potomac Elec. Power Co.*, 123 A.2d 920, 922 (D.C.1956) (same); *Nakajima v. General Motors Corp.*, 857 F.Supp. 100, 103 (D.D.C.1994) (plaintiff must prove willful conduct or its equivalent conduct by "at least a preponderance of the evidence," and the conduct supporting the claim must be "clearly established"); [11] *cf. Raynor v. Richardson–Merrell, Inc.*, 643 F.Supp. 238, 245 (D.D.C.1986) (requiring proof by clear and convincing evidence for award of punitive damages in product liability case). Because punitive damages are, at least from the defendant's perspective, generally in the nature of a fine, it may well be appropriate to require proof by clear and convincing evidence of the commission of the tort and of the outrageousness of the conduct. But Dyer did not, as we have noted, object to the instruction on punitive damages, nor did he argue below that proof by clear and convincing evidence should be required. In light of the uncertain posture of our law on the subject, there was no "obvious" error, nor was there a clear miscarriage of justice. *Banks, supra*, 646 A.2d at 978.

■ Finally, Dyer contends that what he calls "the trial court's post-trial ruling setting aside compensatory damages" precludes the affirmance of the punitive damage award. The trial judge did not, however, set aside the compensatory damage award upon the ground that WSBA suffered no injury. Rather, he credited WSBA's arbitration award against NSSTA against the jury's verdict simply to avoid a double recovery in WSBA's favor. This is not a case in which WSBA was not entitled to punitive damages because it was not injured.

■ Here too, in any event, Dyer did not raise at trial, in his motion for judgment n.o.v., or in his brief on his first appeal, the point he now asserts on his second appeal regarding the alleged necessity of a verdict for compensatory damages as a prerequisite

---

**10.** In order to establish tortious interference with contract, the plaintiff must show that the defendant's procurement of the breach was intentional and without legal justification. *Cooke v. Griffiths–Garcia Corp.*, 612 A.2d 1251, 1256 (D.C. 1992). Punitive damages for a tortious act are available when the defendant's unlawful conduct was accompanied by "fraud, ill will, recklessness, wantonness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Washington Medical Ctr. v. Holle*, 573 A.2d 1269, 1284 (D.C.1990) (citations omitted). In light of the potential overlap between these definitions, trial judges must be alert to the need to frame their instructions to the jury in a way that makes it clear that proof of intentional interference does not automatically entitle the plaintiff to an award of punitive damages.

Arguably, where the tort alleged is an intentional one, inherently containing elements of willfulness, an award of punitive damages must rest upon that tort being committed in an outrageous way; in other words, the "outrageousness" cannot be supplied by the conduct required to commit the tort itself. It may be that, upon timely request, the jury should be so instructed. Moreover, punitive damages are not awarded for breach of contract, and ·an issue might perhaps be raised as to whether such damages may be imposed against one who induces such a breach, or generally in circumstances solely of economic loss where there is no basis for a finding of harm to the public.

In the present case, however, there was no relevant objection to the content of the trial court's charge on punitive damages. *See* Super.Ct.Civ.R. 51. We therefore have no occasion to determine whether the judge's instruction, which was based on Standardized Civil Jury Instructions for the District of Columbia No. 16.1 (Rev. ed. 1981), would have been found to be sufficiently exacting if Dyer had objected to it. Dyer likewise has made no claim in either court that, even assuming the permissibility of some award of punitive damages, the amount of this award is excessive, and we therefore have no occasion to address that issue.

**11.** Because this case is, in our judgment, a comparatively close one on the question whether the evidence was sufficient to establish tortious conduct by Dyer, a plausible contention might be made for the proposition that punitive damages should not be available. As we have noted, however, Dyer did not preserve that issue.

for an award of punitive damages.[12] Given that WSBA undoubtedly suffered harm, the trial judge's failure, *sua sponte,* to set aside the award of punitive damages was not "plainly" or "obviously" wrong. *Banks, supra,* 646 A.2d at 977–79; *see Wardman–Justice Motors v. Petrie,* 59 U.S.App.D.C. 262, 266, 39 F.2d 512, 516 (1930); *cf. Zanville v. Garza,* 561 A.2d 1000, 1001–02 (D.C.1989). There was no plain error.

### D. Counsel Fees.

■■ WSBA's contract with Dyer included a restrictive covenant precluding him, among other things, from soliciting or accepting, directly or indirectly, employment by any client of WSBA for a period of one year after the termination of the agreement. The agreement further provided that in the event of a breach by Dyer, WSBA would be entitled not only to injunctive and other substantive relief, but also to costs and attorney's fees reasonably incurred in pursuing its remedies.

The jury found that Dyer had breached the agreement. It awarded no damages on the breach of contract claim, however, perhaps because of its substantial verdict for WSBA for tortious interference with contract, as well as its award of punitive damages. The judge granted WSBA counsel fees, observing that

> had it not been for the facts which underlie the breach of contract claim, none of these other theories would have been viable. And indeed it is Mr. Dyer's breach of

contract that has caused these proceedings to be commenced.

There is ample record evidence of a breach by Dyer of his contractual obligations. In the words of Judge Nan Huhn (now Shuker), who ordered Dyer to return forthwith documents he had taken from WSBA's offices,

> [i]t is unequivocally clear, according to both the contract between the plaintiff and NSSTA and, in my judgment, *the employee agreement* which says they'll do nothing to disturb the employer's relationship with its clients, that *the taking of those documents was inappropriate. And, if it was actually done the day after his employment, it was borderline theft.* Those documents belonged to the plaintiff. They therefore will be, forthwith, within twenty-four hours from now, returned. All of them.

(Emphasis added).[13]

■■ The trial judge's decision to award counsel fees is reviewable only for abuse of discretion. *See Bagley v. Foundation for the Preservation of Historic Georgetown,* 647 A.2d 1110, 1115 (D.C.1994). In the present case, the judge exercised his discretion judiciously, granting only a portion of the counsel fees requested, while denying injunctive relief on the basis of WSBA's failure to prove the need therefor. We find no basis for reversal.

### E. The Cross–Appeal

■■ In May, 1990, as we have noted, an arbitrator awarded WSBA $25,500, together

---

**12.** "Whether punitive damages will lie depends on the intent with which the wrong was done, and not on the extent of the actual damages." *Holle, supra* note 10, 573 A.2d at 1284. Our decisions on the question whether compensatory damages are a prerequisite for an award of punitive damages have not been a model of consistency. *See First National Realty Co. v. Weathers,* 154 A.2d 548, 550 (D.C.1959) (punitive damages may be awarded in the absence of compensatory damages); *Harris v. Wagshal,* 343 A.2d 283, 288–89 n. 13 (D.C.1975) (same); and *Robinson v. Sarisky,* 535 A.2d 901, 907 (D.C.1988) (punitive damages may be awarded where only nominal damages are shown); *cf. Pyne v. Jamaica Nutrition Holdings, Inc.,* 497 A.2d 118, 133 (D.C.1985) (punitive damages may be returned only where there has been an award of compensatory damages), and *Bay Gen. Indus., Inc. v. Johnson,* 418 A.2d 1050, 1058 n. 21 (D.C.1980) (same). *See*

*generally* I James D. Ghiardi and John J. Kircher, Punitive Damages, Law and Practice, § 537, at 5–53 (1994).

**13.** Dyer contends that WSBA was unsuccessful in its breach of contract claim because the trial judge declined to issue a permanent injunction. The judge denied that relief, however, not because Dyer had complied with the agreement, which he had not, but because WSBA would be fully compensated by the jury's verdict, because the one-year term of the restrictive covenant had expired, and because he was unable to discern any irreparable harm that WSBA would suffer if injunctive relief were denied. The judge was appropriately reluctant, under the circumstances, to award WSBA what he called an unnecessary "additional pound of flesh."

with 15% interest, against NSSTA for breach of contract. In January 1991, WSBA attached NSSTA's bank account and recovered $27,795.02. In a written order dated June 9, 1993, the trial judge ultimately held that the sum WSBA recovered from NSSTA must be credited against WSBA's recovery of compensatory damages, but not against the award of punitive damages. Because the jury awarded WSBA only $20,625 in compensatory damages—less than the amount recovered from NSSTA—the judge's order meant that Dyer would not be required to pay any compensatory damages.

In its cross-appeal, WSBA contends that the judge erroneously credited the arbitration award against its recovery against Dyer. It asserts that the arbitration award represented expenses and lost profits from November 1, 1989 to January 14, 1990, whereas the jury award represented lost profits after January 15, 1990.

 In a suit for tortious interference with contract, "any payments made by the one who breaches the contract must be credited in favor of the one who induced the breach." *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 172 (Tenn.App.1987). This is because, "in the absence of punitive damages, a plaintiff can recover no more than the loss actually suffered." *Kassman v. American Univ.*, 178 U.S.App.D.C. 263, 268, 546 F.2d 1029, 1033 (1976).

In his written order, the trial judge, after discussing the *Kassman* decision, analyzed WSBA's contention as follows:

Applying [*Kassman*] to the present case, WSBA has suffered but one loss, that which resulted from the breach of the contract with NSSTA. To allow WSBA to retain the $27,795.02 arbitration award in addition to the jury award would bestow a windfall by allowing for double recovery on one injury. Where there has been but one injury, the law confers only one recovery, irrespective of the multiplicity of parties or theories which the plaintiff pursues. [*Kassman*] at 268, 546 F.2d at 1034.

Plaintiff has not persuaded the court that nothing in the arbitration award was included within the judicial award. Contrary to plaintiff's argument, it is not as clear as he contends that the elements of the judicial award are not included in the arbitration award and vice versa. It appears more likely than not that the judicial award contains compensatory damages covered by the arbitration award. If this lawsuit had been filed against both William Dyer and NSSTA, it can not be said that the jury award would have been any different. For this court to draw an arbitrary distinction and separate the arbitration award from the judicial award would be an abuse of discretion.

The trial judge was closer to the fray than we are, and in a better position to determine whether denial of Dyer's motion for a remittitur would have resulted in a double recovery for WSBA. We find no error.

### IV.

### CONCLUSION

For the reasons stated, the judgment of the trial court is hereby in all respects

*Affirmed.*