BWX ELECTRONICS, INC., a Body
Corporate of the State of
Maryland, Appellant,

v.

CONTROL DATA CORPORATION, a
Body Corporate of the State
of Delaware.

No. 89–7275.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 28, 1991.

Decided April 2, 1991.

Alan I. Baron, with whom Stephen L. Snyder, Baltimore, Md., was on the brief, for appellant.

Richard J. Leveridge, with whom Michael E. Nannes and David L. Engelhardt, Washington, D.C., were on the brief, for appellee.

Before MIKVA, Chief Judge, EDWARDS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a diversity action brought by appellant, BWX Electronics, Inc. ("BWX"), against appellee, Control Data Corporation ("CDC"), for breach of contract and fraud. In its contract claim, BWX alleged that CDC intentionally breached an agreement under which BWX had an exclusive option to negotiate for the purchase of a business and a building owned by CDC. In its fraud claim, BWX asserted that CDC had induced it to enter into the disputed agreement without ever intending to negotiate exclusively or in good faith with BWX. The District Court granted summary judgment for CDC on the breach of contract claim; the fraud claim, however, was tried before a jury. After trial, the jury returned a verdict for BWX and awarded it $23,750 in compensatory damages.

On this appeal, BWX contends that the trial court erred in three respects: first, in awarding CDC summary judgment on the breach-of-contract claim; second, in granting CDC's motion for a directed verdict on BWX's plea for punitive damages on its fraud claim; and third, in granting CDC's motion *in limine* to exclude certain evidence and argument that BWX sought to offer in support of its claim for punitive damages. On the record before us, we can find no merit in BWX's claims. We therefore affirm the judgments of the District Court.

## I. BACKGROUND

CDC is a Minnesota-based company that manufactures and sells computers and related products. Prior to 1986, CDC supplied itself with the cable assemblies used to interconnect computer components through a wholly owned business, Capital Manufacturing Operations ("the Capital business"), located in the District of Columbia. In 1986, however, CDC's requirements for these cable assemblies declined due to changes in technology and markets. CDC therefore decided to sell the Capital business.

In May 1986, CDC solicited bids from several prospective buyers. After reviewing these proposals, CDC initiated discussions with American Technology Corporation ("ATC"), a Baltimore-based electronics firm, and one other bidder. In August 1986, CDC elected to negotiate exclusively with ATC for the sale of both the Capital business and the building in which it was housed ("the Capital building").

At ATC's request, CDC agreed to substitute BWX, a company apparently formed for the sole purpose of negotiating and effectuating the purchase transaction, as the potential purchasing entity of these properties. On September 5, 1986, BWX and CDC entered into a Letter of Intent ("LOI"). Under the terms of the LOI, CDC agreed to negotiate exclusively and in good faith with BWX for a limited time regarding the sale of both the Capital business and the Capital building. The LOI contemplated that negotiations concerning the two properties would proceed separately: the closing of the Capital business was to occur on or before September 30, 1986; the sale of the Capital building would take place "no later than three months from the Closing Date [on the Capital business], or December 31, 1986, whichever occurs first." [1] The LOI further provided that "[i]f the Closing [on the sale of the Capital business] has not occurred on or before September 30, 1986, this letter will expire." [2]

---

**1.** LOI, para. 7, *reprinted in* Deferred Appendix ("D.A.") 724.

**2.** *Id., reprinted in* D.A. 719.

In exchange for these exclusive negotiating rights, BWX paid CDC $15,750 as a deposit towards the purchase price of the Capital business. The LOI provided that the deposit would be non-refundable in the event the parties failed to reach agreement on the sale of the business, unless that failure resulted from CDC's bankruptcy, inability to obtain necessary corporate approval of the final agreement or some other event "unrelated to the parties' mere failure to reach agreement." [3]

Despite extensive negotiations over the next several weeks, the parties failed to reach any agreement by the September 30 closing deadline. On October 13, 1986, after additional bargaining efforts in early October proved unproductive, CDC notified BWX that it was terminating negotiations concerning both the Capital business and the Capital building. Approximately one month thereafter, CDC offered to refund the $15,750 deposit that BWX had paid, but BWX rejected that offer.

After negotiations between BWX and CDC had ended, CDC commenced negotiations with Edward R. Webster, a District of Columbia entrepreneur who owned property adjacent to the Capital building, and who had expressed some interest in the Capital building prior to CDC's involvement with BWX. On or about November 12, 1986, CDC and Webster entered into a contract for Webster's purchase of the Capital building, and the deal closed in late December 1986. In January 1987, CDC sold the Capital business separately to Stewart Peterson Industries, Inc.

BWX thereupon brought suit in the Superior Court of the District of Columbia stating claims for breach of contract and fraud, and seeking both compensatory and punitive damages. In its contract claim, BWX alleged that CDC had intentionally breached the LOI by selling the Capital

building to a third party prior to December 31, 1986, the date, according to BWX, that its exclusive option to negotiate for the sale of the building expired. BWX's fraud claim alleged that CDC had induced BWX to enter into the LOI without ever intending to negotiate exclusively and in good faith with BWX concerning the sales of the Capital business and building.

Upon CDC's motion, the case was removed to the District Court for the District of Columbia based on the diversity of citizenship of the parties. *See* 28 U.S.C. § 1441 (1988). Prior to trial, BWX moved for partial summary judgment on its breach of contract claim, arguing that the LOI created an enforceable option for BWX to purchase the Capital building extending from September 5 until December 31, 1986, and that CDC had breached that option by selling the building to Webster during this period.[4] In response, CDC requested summary judgment in *its* favor on BWX's contract claim. CDC argued that the LOI did not create an option contract for the purchase of the Capital building, but merely an agreement to negotiate, and that this agreement had expired by its own terms before CDC even began negotiations with Webster.[5] Finding CDC's construction of the LOI to be correct, the trial court entered summary judgment for CDC and against BWX.[6]

Thereafter, the District Court granted CDC's motion *in limine* to exclude certain evidence and argument from trial on the remaining fraud claim.[7] Relevant to this appeal are the trial court's exclusion of: (i) evidence or argument pertaining to BWX's claims that CDC had engaged in sham negotiations with BWX in order to convince the District of Columbia Government that it had attempted to sell the Capital business and building to minority interests; and (ii) evidence or argument concerning

3. *Id.*, para. 8, *reprinted in* D.A. 724.

4. Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, *reprinted in* D.A. 27, 29–33.

5. Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, *reprinted in* D.A. 35, 45–51.

6. *BWX Elecs., Inc. v. Control Data Corp.*, Civ. Action No. 87–1773, mem. op. at 12–13 (D.D.C. May 3, 1988), *reprinted in* D.A. 145, 156–57.

7. *BWX Elecs., Inc. v. Control Data Corp.*, Civ. Action No. 87–1773, order (D.D.C. Mar. 30, 1989), *reprinted in* D.A. 411.

CDC's alleged instigation of employee unrest at the Capital business in October 1986.

After BWX had presented its case-in-chief at trial, the trial court granted a directed verdict for CDC on the issue of punitive damages, finding that BWX had not presented any evidence of outrageous conduct necessary to support such damages. On September 29, 1990, the jury returned a verdict for BWX, awarding it compensatory damages of $23,750 on its fraud claim. This amount was based upon the $15,750 that BWX had paid CDC to secure its exclusive negotiating rights under the LOI, plus $8,000 in out-of-pocket expenses that BWX had incurred during the negotiations.

## II. DISCUSSION

### A. *Choice of Law*

■ As noted above, the property at issue in this case was located in the District of Columbia. Some of the negotiations concerning the LOI, however, took place in Maryland, and the LOI was signed in both Maryland (by BWX) and in Minnesota (by CDC), giving rise to the question of which jurisdiction's contract and tort law should apply.[8]

Although the record before us does not disclose an explicit choice of law determination by the District Court,[9] both BWX and CDC relied exclusively upon District of Columbia substantive law in their pre-trial briefs,[10] and the District Court referred solely to District of Columbia law in addressing CDC's motion for directed verdict on BWX's fraud claim.[11] Neither party has objected to this choice of law on appeal, and, finding no apparent error in the District Court's choice, we shall apply District of Columbia law as well. *See Nello L. Teer Co. v. Washington Metropolitan Area Transit Authority*, 921 F.2d 300, 302 n. 2 (D.C.Cir.1990) (applying same law as that applied by District Court where neither party objected to choice of law, and where there was no apparent error in choice made).

### B. *BWX's Breach-of-Contract Claim*

■ BWX contends that, by selling the Capital building to Webster in December

**8.** The District Court's exclusionary rulings regarding BWX's evidence, of course, are governed by the Federal Rules of Evidence. *See Ealy v. Richardson–Merrell, Inc.*, 897 F.2d 1159, 1163 (D.C.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 370, 112 L.Ed.2d 332 (1990); *Richardson ex rel. Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 825 n. 9 (D.C.Cir.1988), *cert. denied*, — U.S. —, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989); *Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 715 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990, 991 (1987).

**9.** In issuing its summary judgment decision dismissing CDC's contract claim, the District Court did not choose among Maryland, Minnesota and District of Columbia law, properly finding that the laws of those jurisdictions were identical with regard to the contractual principles at issue. *See BWX Elecs., Inc. v. Control Data Corp.*, Civ. Action No. 87–1773, mem. op. at 6 (D.D.C. May 3, 1988), *reprinted in* D.A. 150. In subsequently addressing BWX's motion for reconsideration of this decision as well as a motion by CDC for summary judgment on BWX's fraud claim, the court noted that the parties had relied on both Maryland and District of Columbia law, and, again finding no conflict, based its decision upon the laws of both jurisdictions. *See BWX Elecs., Inc. v. Control Data Corp.*, Civ. Action No.

87–1773, mem. order at 2 n. 1 (D.D.C. July 28, 1988), *reprinted in* D.A. 401, 402.

**10.** *See* Plaintiff's Amended Trial Brief, *reprinted in* D.A. 430; Defendant's Trial Brief, *reprinted in* D.A. 444.

**11.** The relevant statements by the District Court concerned the compensatory damages properly recoverable by BWX:

> I had previously ruled that the only compensatory damages that are collectible under the law of the District of Columbia are out-of-pocket expenses.... Having made that ruling, the law of this case is that the plaintiff in the matter of compensatory damages is confined to a recovery of not more than the initial down payment ... plus out-of-pocket expenses....

Transcript ("Tr.") at 400, *reprinted in* D.A. 648; *see also id.* at 505, *reprinted in* D.A. 651 ("I'm not going to tell the jury that they can give a verdict as to damages which arise from the so-called benefit of the bargain. That's out in this jurisdiction...."); *id.* at 509, *reprinted in* D.A. 655 ("At the time we wrote [the July 28 memorandum order,] ... we ruled that in this jurisdiction, I'm reasonably sure we are right, out-of-pocket expenses are all that can be recovered under compensatory damages. We held that the benefit-of-the-bargain theory did not apply in this jurisdiction.").

1986, CDC breached its contractual obligations under the LOI. This claim is premised entirely upon paragraph seven of the LOI, which provides in pertinent part:

> Upon execution of the Letter of Intent and receipt by Seller of [BWX's $15,750 payment] ..., Seller agrees to negotiate exclusively and in good faith with Buyer for the sale to Buyer of the Capital building at fair market value to occur no later than three months from the Closing Date [on the sale of the Capital business], or December 31, 1986, whichever occurs first.

LOI, para. 7, *reprinted in* D.A. 724. BWX submits that CDC's obligation under this provision to negotiate exclusively with BWX for the sale of the Capital building was entirely independent of its separate negotiation obligation concerning the sale of the Capital business. BWX thus claims that, as the parties did not close on the Capital business by the September 30, 1986 "closing date," the "December 31, 1986" deadline applied, and CDC's sale of the Capital building to Webster prior to that date was a breach of the LOI.

■ BWX's interpretation fails because it completely ignores the other provisions of the LOI. It is a fundamental tenet of contract interpretation that a contract provision should be interpreted, where possible, as consistent with the contract as a whole. *See, e.g., Phenix–Georgetown, Inc. v. Chas. H. Tompkins Co.,* 477 A.2d 215, 225 (D.C.1984) (contracts generally should be read as a whole, and every part should be interpreted with reference to the whole); *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C.1984) (writing must be interpreted as a whole, giving reasonable, lawful and effective meaning to all its terms). BWX's reading of paragraph seven, however, is flatly inconsistent with the rest of the LOI.

The sale of the Capital *business* was clearly both the primary focus of the LOI and a *sine qua non* to the sale of the building. More importantly, the sole legal obligation that the LOI imposed upon CDC was that, "[d]uring the pendency of the negotiations of the definitive agreement" for sale of the business, CDC could not "engage in negotiations with any other party for *any* sale of the Capital assets *including the real estate.*"[12] And, most significantly, the parties agreed that this limited obligation would terminate if negotiations concerning the business did not bear fruit within a specified time. Paragraph one of the LOI stated:

> The Closing Date for the purchase [of the Capital business] will occur on or before September 30, 1986 (the "Closing" or "Closing Date"). If the Closing has not occurred on or before September 30, 1986, *this letter will expire....*

LOI, para. 1 (emphasis added), *reprinted in* D.A. 719.

The foregoing provisions, read together, permit only one interpretation. Upon signing the LOI, the parties were to attempt to negotiate a binding agreement on the sale of the Capital business by September 30, 1986, and were also to begin negotiations concerning sale of the Capital building. During this period, CDC could not negotiate with any other party concerning sale of either property. If the parties succeeded in arranging the sale of the business, they would continue negotiations regarding sale of the Capital building. If, however, the parties could not reach agreement on the sale of the business by September 30, 1986, the LOI would expire, and with it, CDC's exclusive negotiating obligations with regard to both the Capital business *and* the Capital building.[13]

---

**12.** *Id.,* para. 4 (emphasis added), *reprinted in* D.A. 723.

**13.** This interpretation does not render the parties' reference to December 31, 1986, mere surplusage. The parties presumably included this alternate date to establish an absolute deadline for closing a sale of the Capital building—three months from September 30, 1986, the agreed-upon cut-off for the closing on the sale of the business. Thus, if the parties subsequently waived the September 30, 1986, deadline and closed on the sale of the Capital business at a later date, such a waiver would not prolong the negotiations period for the Capital building beyond the 1986 year-end cut-off that the parties had envisioned when they executed the LOI.

The sale of the Capital business did not close by September 30, 1986; accordingly, paragraph seven, along with the rest of the LOI, expired on that date. As there is no evidence that CDC negotiated with anyone other than BWX from the date the LOI was executed until September 30, 1986, we affirm the District Court's decision to grant summary judgment for CDC on the contract claim.

### C. *The Directed Verdict on Punitive Damages*

#### 1. Proof of Fraud

■ BWX argues that, merely by establishing its claim for fraud at trial, it satisfied the requirements for an award of punitive damages under District of Columbia law. BWX relies primarily upon *Harris v. Wagshal*, 343 A.2d 283, 288 (D.C.1975), where the District of Columbia Court of Appeals stated that "[p]roof of fraud ... is itself sufficient to support an award of exemplary damages, since fraud necessarily encompasses malice." BWX contends that, based on this precedent, the question of whether to award punitive damages on the basis of CDC's fraudulent misrepresentations should have been left for the jury to decide as the finder of fact. We disagree.

Since *Harris* was decided, several District of Columbia cases have held that proof of fraud alone, unaccompanied by aggravating circumstances, is *not* sufficient to justify punitive damages. In *Price v. Griffin*, 359 A.2d 582 (D.C.1976), the Court of Appeals reversed a jury award of punitive damages for a fraudulent misrepresentation claim under the District's Blue Sky securities laws. The court noted that punitive damages are "not a favorite of the law," and stated that such awards are appropriate "only when the tort is aggravated by evil motive, *actual* malice, deliber-

ate violence or oppression." *Id.* at 589 (internal quotation marks and citation omitted; emphasis added). Upon finding that the evidence did not demonstrate defendant's "malice or bad faith," "recklessness or wholesale disregard of the interest of investors," the court reversed the award of punitive damages. *Id.* at 590.

Soon thereafter, in *Feltman v. Sarbov*, 366 A.2d 137 (D.C.1976), the Court of Appeals relied on *Price* in setting aside a punitive damages award in a common-law fraud case where the finding of fraud rested on a "narrow ground." *Id.* at 141. The court in *Feltman* also alluded to the disfavored status of punitive damages, and noted that their purpose is to punish "maliciousness, wantonness, *gross* fraud, recklessness and willful disregard of another's rights." *Id.* (citation omitted; emphasis added). Finding that the record did not contain any evidence of "special aggravating circumstances upon which a verdict for punitive damages could be based," the court set aside the jury's award of punitive damages. *Id.*

More recently, the Court of Appeals again reversed a punitive damage award in a fraud action in *Boynton v. Lopez*, 473 A.2d 375 (D.C.1984), finding that the plaintiff had not shown "evil motive, *actual* malice, deliberate violence or oppression .... willful and outrageous conduct .... or *gross* fraud." *Id.* at 377 (citations and quotation marks omitted; emphasis added). *See also, Lyons v. Jordan*, 524 A.2d 1199, 1204 (D.C.1987) (punitive damages appropriate where defendant's conduct evinces "*gross* fraud, willful disregard of the plaintiff's rights, or other aggravating circumstances") (emphasis added).[14]

Although *Harris* has not been expressly overruled by the *Price* line of cases, we believe that the latter cases accurately re-

---

**14.** Since *Price,* this court as well has recognized that more than mere fraud is required under District law to justify punitive damages. *See Mariner Water Renaturalizer, Inc. v. Aqua Purification Sys.,* 665 F.2d 1066, 1071 (D.C.Cir.1981) (per curiam) (upholding denial of punitive damages by District Court sitting as finder of fact where fraudulent misrepresentation was "willful," but not so outrageous as to render denial

of punitive damages an abuse of discretion); *Nader v. Allegheny Airlines, Inc.,* 626 F.2d 1031, 1035 (D.C.Cir.1980) (rejecting punitive damages award under District law on the grounds that defendant's representation was not "so gross and wanton" as to justify such an award, apart from whether it was "false and fraudulent in a technical sense").

flect the current law of the District of Columbia. Accordingly, we uphold the District Court's determination that BWX was required to demonstrate aggravating circumstances beyond mere fraud in order to support its plea for punitive damages.

### 2. Aggravating Circumstances

■ BWX points to three facts that purportedly justify a finding of aggravating circumstances sufficient to support punitive damages: (i) testimony that, notwithstanding CDC's agreement to negotiate exclusively with BWX, CDC had been in contact with Webster concerning sale of the Capital building in the spring of 1986; (ii) testimony that Webster had received an appraisal of the Capital building in September or early October, during the time when CDC·and BWX were still negotiating; and, (iii) evidence that Webster obtained a commitment for title insurance on the Capital building as of "October 6, 1986."

None of these facts, however, suggests "willful and outrageous" conduct by CDC. CDC's contact with Webster in the spring of 1986 proves nothing of relevance, for the LOI was not executed until September 5, 1986, and CDC owed no duty to BWX with regard to negotiations concerning the Capital building prior to that time. Moreover, the evidence concerning the contact between Webster and CDC in early 1986 indicates that no negotiations concerning the property then took place.[15]

Nor is there any indication of aggravating circumstances in CDC's providing Webster with the "appraisal" referred to by BWX. The author of this document, a CDC employee, testified at trial that it was nothing more than a value-analysis of the Capital property that CDC itself prepared in June 1986. This appraisal was based on information that had been received from Webster and other local property owners and realtors regarding property values in

the area of the Capital building.[16] Even if CDC had reason to expect (or hope) that Webster might use this appraisal to make an offer on the building in the event that the CDC and BWX negotiations failed, this would hardly be evidence of "willful and outrageous" conduct.

Finally, the trial testimony indicated that the "October 6" date on Webster's title insurance referred merely to the effective date of the title insurance company's guarantee of good title; the policy itself was not purchased until November 1986. As both Webster and a representative of the title company testified, title insurance companies regularly guarantee title as of a date some weeks previous to the time when they issue the policy.[17] Accordingly, while Webster's policy had an "effective date" in October, the policy itself was purchased weeks later, *after* CDC's and BWX's negotiations had terminated. Again, BWX cites no record evidence that contradicts this testimony.

In sum, BWX points to no evidence in the record that could have supported a finding of "willful and outrageous" conduct, "gross fraud," "actual malice" or other aggravating circumstances necessary to sustain an award of punitive damages under District of Columbia law. CDC was therefore entitled to a directed verdict on the issue of punitive damages.[18]

### D. *The Ruling* In Limine

The District Court excluded from trial any evidence or argument concerning either BWX's claim that CDC entered into "sham" negotiations with BWX in order to curry favor with the District of Columbia Government or BWX's allegations that CDC instigated employee unrest to sabotage its negotiations with BWX. BWX challenges both rulings, arguing that evidence and argument on these issues would

---

**15.** *See* Tr. at 223–24, 414–15, *reprinted in* D.A. 562–63, 616–17.

**16.** *See* Tr. at 413–16, *reprinted in* D.A. 615–18. CDC's uncontradicted trial testimony indicated that CDC shared the appraisal with all those who had contributed to its preparation.

**17.** *See* Tr. at 233–35, 485–90, 494–96, *reprinted in* D.A. 569–71, 620–28.

**18.** As CDC has not challenged the jury's fraud verdict, we of course express no opinion on the sufficiency of the evidence to support that verdict.

have demonstrated outrageous and willful conduct by CDC and therefore bolstered its claim for punitive damages.

### 1. The Sham Negotiations Argument

BWX contends that the District Court improperly excluded evidence and argument suggesting that CDC's motive for defrauding BWX was its desire to impress upon the District of Columbia Government that it was a "good corporate citizen" willing to negotiate with a minority enterprise for the sale of its building. The District Court properly rejected this evidence. At no point in the litigation did BWX proffer anything more than unsubstantiated allegations in support of its claim. BWX's failure to suggest a single piece of tangible evidence supporting its allegations of improper motive dooms its challenge to the District Court's ruling. *See* Fed.R.Evid. 103(a)(2) (prerequisite to finding of error where evidence is excluded is that "substance of the evidence ... [be] made known to the court by offer or [be] ... apparent from the context within which questions were asked"); *United States v. Wright*, 783 F.2d 1091, 1098–99 (D.C.Cir.1986) (failure to inform district court of specific nature of excluded evidence precludes finding of error). Accordingly, we find that the District Court properly excluded all evidence and argument relating to BWX's unfounded allegations.

### 2. Evidence of Workers' Unrest

BWX also sought to argue that CDC, through the dissemination of false and misleading information, incited employee dissension at the Capital business concerning the proposed sale to BWX, and subsequently used that ill-will (and an ensuing work stoppage) as an excuse for terminating contract negotiations. The District Court excluded such evidence, accepting CDC's argument that it was irrelevant to BWX's fraud claim.

Again, we find no error in the District Court's ruling. A "trial judge has wide discretion to admit or exclude evidence where the question is one of relevancy." *United States v. Anderson*, 851 F.2d 384,

393 (D.C.Cir.1988) (internal quotation omitted), *cert. denied*, 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989). The work stoppage that CDC allegedly used as a pretext for terminating negotiations with BWX occurred on October 7, 1986. CDC had no need to create an "excuse" for discontinuing negotiations in October— CDC was then legally entitled to terminate negotiations with BWX for whatever reason it chose, or, indeed, for no reason at all. Whatever may have been CDC's stated reasons for breaking off what by then had become entirely voluntary negotiations, those reasons do not reflect upon CDC's intentions and good faith at the time its negotiations with BWX were obligatory. As a result, we find that the District Court acted within its permissible discretion in excluding evidence concerning employee unrest at the Capital business as irrelevant to BWX's fraud claim.

### III. Conclusion

For all of the foregoing reasons, the judgment of the District Court is affirmed.

*So Ordered.*