Sherri R. LeSANE, et al., Plaintiffs,

v.

HILLENBRAND INDUSTRIES, INC., Defendants,

v.

MIDMARK CORP., et al., Third–Party Defendants.

Civ. A. No. 89–1810 SSH.

United States District Court, District of Columbia.

April 21, 1992.

Elizabeth A. Karasik, Dean E. Swartz, Washington, D.C., for plaintiffs.

Laurence T. Scott, Washington, D.C., for Hillenbrand.

David A. Levin, Michael T. Wharton, Annapolis, Md., for General Medical Corp., General Medical Mfg. Co.

Donald P. Maiberger, Rockville, Md., for Midmark Corp.

Daniel J. Standish, U.S. Atty.'s Office, Washington, D.C., for U.S.

Walter J. Murphy, Washington, D.C., for Cambridge Scientific Industries.

## OPINION

STANLEY S. HARRIS, District Judge.

This case results from the death of plaintiffs' fourteen-month old daughter, Lindsey LeSane. While at Walter Reed Army Medical Center, the baby's neck allegedly became trapped between the top and the side rail of a crib distributed by Hill–Rom Company, Inc., a subsidiary of Hillenbrand Industries. The plaintiffs are suing Hill–Rom, Hillenbrand, and the United States for Lindsey's subsequent death. Hill–Rom and Hillenbrand, in turn, have filed third-party complaints against Midmark Corporation, Cambridge Scientific Industries (CSI), General Medical Corporation and its subsidiary General Medical Manufacturing Company, all manufacturers of cribs similar to the one in which Lindsey was injured, and the United States.[1] The United States has cross-claimed against Hill–Rom.

Before the Court are several motions: (1) Hill–Rom's motion for partial summary judgment as to punitive damages; (2) third-party defendants Midmark's, CSI's, and General Medical's respective motions for summary judgment; and (3) plaintiffs' motion for a separate trial.

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56." Fed.R.Civ.P. 52(a). Nevertheless, in part because of the multiplicity of parties, the Court sets forth briefly its conclusions.[2]

*Punitive Damages*

■ Plaintiffs seek punitive damages from Hill–Rom. Punitive damages are not favored by the law. *See BWX Electronics, Inc. v. Control Data Corp.,* 929 F.2d 707, 712 (D.C.Cir.1991). To prevail at trial on the issue of punitive damages, plaintiffs would have to provide evidence sufficient to allow a trier of fact to find that Hill–

---

**1.** Hereafter, the Court will refer to both Hillenbrand and Hill–Rom as "Hill–Rom." General Medical Corporation and its subsidiary will be referred to as General Medical. Also, at the time of the transaction involved in these motions, CSI was a division of Dubois Chemical Company, which was a division of Chemed. The Court refers collectively to these entities as CSI.

**2.** Without specifically briefing the issue, all parties assume that District of Columbia law applies. Accordingly, the Court applies the law of the District of Columbia. *Cf. In re Korean Air Lines Disaster,* 932 F.2d 1475, 1495 (D.C.Cir.) (Mikva, J., dissenting as to Part II(C)) ("Unlike jurisdictional issues, courts need not address choice of law questions *sua sponte*."), *cert. denied,* —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

Rom acted with wanton negligence which resulted in injury to Lindsey.[3] Mere or even gross negligence is insufficient to support an award of punitive damages. *See Knippen v. Ford Motor Co.*, 546 F.2d 993, 1001 (D.C.Cir.1976). Rather, plaintiffs would have to show " 'evil motive, actual malice, deliberate violence or oppression.... willful and outrageous conduct.... or gross fraud.' " *BWX Electronics*, 929 F.2d at 712 (emphasis omitted) (quoting *Boynton v. Lopez*, 473 A.2d 375, 377 (D.C.1984) (citations omitted)). Viewing the evidence in a light most favorable to plaintiffs, the Court finds that no reasonable jury could find wanton negligence by a preponderance of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (noting that the standard for summary judgment "mirrors the standard for a directed verdict"). Therefore, the Court grants Hill–Rom's motion for partial summary judgment as to plaintiffs' claim for punitive damages.

### Third-party Defendants' Motions for Summary Judgment

Hill–Rom asserts three theories to support liability as to third-party defendants. First, Hill–Rom alleges they are liable as successor manufacturers of the type of crib which allegedly injured Lindsey. Second, Hill–Rom claims that Midmark owed Hill–Rom a duty to warn which Midmark breached. Third, Hill–Rom claims that there is a genuine issue of fact for trial as to whether Hill–Rom or CSI manufactured the crib top attached to the crib in which Lindsey was injured. The Court addresses each of these issues in turn.

### Successor Liability

Hill–Rom seeks indemnity and contribution from third-party defendants under a theory of successor liability. Hill–Rom alleges that third-party defendants are successors-in-interest to Hurlco Health Products Company, Inc., the now-defunct company which manufactured the crib in which the infant was injured.[4] The Court finds that successor liability is inapplicable under the facts of this case.

Only one court has addressed the question of successor liability under District of Columbia law. *See Rivas v. District Int'l Trucks*, No. 85–3411, 1989 WL 117871, 1989 U.S.Dist. LEXIS 11859 (D.D.C. Oct. 5, 1989). In this relative absence of District of Columbia law, the Court must attempt to discern what law the courts of the District of Columbia would be likely to adopt. *See Hull v. Eaton Corp.*, 825 F.2d 448, 453 (D.C.Cir.1987) (citing 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4507, at 103 (1982)). To accomplish this, the Court refers to the law of Maryland for guidance. *See Hull*, 825 F.2d at 453–54. Maryland has followed the majority of the states, adopting "the general rule of nonliability of successor corporations, with its four well-recognized traditional exceptions." *Nissen Corp. v. Miller*, 323 Md. 613, 594 A.2d 564, 573 (1991). In so doing, the Maryland Court of Appeals expressly rejected a fifth exception adopted by a minority of jurisdictions, the "continuity of enterprise" exception. *See id.*, 594 A.2d at 573. In addition, although it did not reach the issue of whether Maryland would adopt a sixth exception, known as the "product line" exception, the Court of Appeals noted that such an exception had been rejected by many jurisdictions as "too far-reaching and radical." *Id.*, 594 A.2d at 567 n. 1 (quoting 1 *American Law of Products Liability 3d* § 7:27, at 44 (Travers, rev. ed. 1990) (hereinafter *Products Liability*) (footnote omitted)). Moreover, this Court's Magistrate Judge Attridge declined to apply the "product line" exception in *Rivas*. *See Rivas*, 1989 U.S.Dist. LEXIS 11859, at *13–*16. Therefore, the Court finds that District of Columbia courts are

---

**3.** At least one judge in this Circuit has noted that evidence to support punitive damages must be "clear and convincing". *See Raynor v. Richardson–Merrell, Inc.*, 643 F.Supp. 238, 245 (D.D.C.1986). As the Court finds that the evidence relied on by plaintiff does not even meet the preponderance standard, the Court does not reach this issue.

**4.** All parties agree that Hurlco manufactured the crib at issue, but there is a dispute as to which company manufactured the crib top. *See infra.*

unlikely to adopt either of the minority rules, but would instead adopt the general rule of nonliability with its four traditional exceptions.

The general rule of nonliability, with its four exceptions, is that:

"[A] corporation which acquires all or part of the assets of another corporation does not acquire the liabilities and debts of the predecessor, unless: (1) there is an express or implied agreement to assume the liabilities; (2) the transaction amounts to a consolidation or merger; (3) the successor entity is a mere continuation or reincarnation of the predecessor entity; or (4) the transaction was fraudulent, not made in good faith, or made without sufficient consideration."

*Nissen*, 594 A.2d at 565–66 (quoting *Products Liability, supra*, § 7:1, at 10–12 (footnotes omitted)).

### A. Liability of CSI

Hill–Rom alleges that CSI is the first successor corporation to Hurlco. Therefore, the Court begins its analysis with CSI's potential liability. The question before the Court is whether the circumstances of the transfer render CSI liable as a successor to Hurlco under one of the four exceptions to the general rule of nonliability.

Hurlco began making its crib in 1974. John Hurley, the founder of Hurlco, had designed the crib with the help of an engineer. From 1974 to 1976, Hurlco distributed the crib through a company known as Interroyal. Then, from 1976 until late 1977 or early 1978, Hill–Rom was Hurlco's exclusive distributor. In late 1977 or 1978, Bay Bank Norfolk Trust Company foreclosed on Hurlco's assets. In March of 1978, CSI purchased Hurlco's former assets from Bay Bank. These assets included work in progress, raw materials, and equipment. Although plaintiff contends that CSI bought these assets directly from Hurlco, the "General Assignment and Bill of Sale" between CSI and Bay Bank indicates that Bay Bank had good and marketable title to these assets. The evidence pointed to by plaintiffs to support their position, the depositions of John Hurley and Donald Holdt,

is not sufficient to create a genuine issue of material fact. To the contrary, the depositions reveal that no genuine issue of fact exists. In his deposition, Hurley stated that he was "broke," that Bay Bank foreclosed on his assets, and that Bay Bank sold the assets to CSI. Although it is possible CSI discussed purchasing the assets from Hurley prior to foreclosure by the bank, Hurley states that he remembers telling Holdt that if he was interested in purchasing the assets, he would have to deal with the bank.

Through a separate agreement, CSI paid royalties directly to Hurley for the use of his patents. Hurley also was hired as an independent consultant for CSI for a period of one year. This agreement specifically stated that Hurley was to be merely an independent contractor and it expressly recognized that he was a full-time employee for a third-party. Other than this consulting agreement, no Hurlco employees were hired by CSI. CSI also received some engineering drawings, some files, and some promotional materials. CSI moved the manufacturing equipment from Weymouth, Massachusetts, to Cambridge, Maryland. Therefore, it did not use Hurlco's manufacturing facility.

Several weeks after receiving the Hurlco assets, CSI began manufacturing cribs identical to those previously manufactured by Hurlco. CSI did not use Hill–Rom to distribute its cribs, but instead used the same network it had developed for its line of stretchers. It did, however, use some of Hurlco's suppliers. Plaintiffs also allege, and the Court assumes it to be true for the purposes of this motion, that if Hurlco crib owners had problems with their cribs, CSI would provide parts and work. After several years of manufacturing the crib, CSI sold the assets of the crib line, along with the assets of its stretcher line, to what was then known as Whittaker General Medical Company, now General Medical.

#### 1. No Express or Implied Agreement

■ Here, the transaction between CSI and Bay Bank was merely an asset acquisi-

tion by CSI from the bank. Hurlco was not a party to the agreement. There is no language in the agreement which could be construed to create an inference that CSI had implicitly or expressly assumed the liabilities of Hurlco, especially the type of liability at issue here. *See Baltimore Luggage Co. v. Holtzman*, 80 Md.App. 282, 562 A.2d 1286, 1292 (1989), *cert. denied*, 318 Md. 323, 568 A.2d 28 (1990). In addition, neither the royalty agreement nor the consulting agreement could in any way be construed to be an assumption of liability. Moreover, the mere fact that CSI provided parts and work to former Hurlco customers is not sufficient to imply an assumption of product liability for the cribs manufactured by Hurlco. *Cf. Nissen*, 594 A.2d at 565, 567 (noting that none of the traditional exceptions to nonliability applied in a case in which asset-acquiring corporation had supplied replacement parts).

### 2. Does Not Amount to a Consolidation or Merger

■ Likewise, the asset purchase by CSI from Bay Bank cannot be considered a consolidation or a merger of Hurlco and CSI. First, Hurlco was not a party to the purchase. This alone may be enough to support a conclusion that no merger or consolidation occurred. It also eliminates the possibility that this was not an armslength transaction. However, the Court need not rest its conclusion on that basis alone, as other evidence adequately supports it. No stock exchanged hands; no cash went to Hurlco. There was no continuity of ownership or employees.[5] CSI did not continue the business in the same location as Hurlco, nor did it assume all of Hurlco's liabilities. Hurlco's corporate entity continued to exist, albeit in shell form, after CSI's purchase of its assets. CSI continued to exist after the asset purchase and merely integrated the assets and crib production into its already existing product line. Therefore, the Court finds that there is no evidence that this transaction amounted to a consolidation or merger.

**5.** The Court finds that the royalty and consulting agreement with Hurley does not amount to

### 3. Mere Continuation

■ As the Court has rejected the expanded definition of mere continuation embodied in the "continuity of enterprise" exception, the Court addresses the traditional test of mere continuation. The traditional test for "mere continuation" focuses on whether " 'there is a continuation of directors and management, shareholder interest and, in some cases, inadequate consideration. The gravamen of the traditional "mere continuation" exception is the continuation of the *corporate entity* rather than continuation of the business operation.' " *Nissen*, 594 A.2d at 567 (quoting 1 Frumer & Friedman, *Products Liability*, § 2.06[2][c], at 2–182 to 2–183 (1989) (emphasis in original)). Here, for the same reasons this transaction did not amount to a merger or consolidation, the evidence does not support liability of CSI based on a "mere continuation" theory. *Cf. Nissen*, 594 A.2d at 565–67 (finding, on similar facts, that no "mere continuation" occurred).

### 4. Fraud

No evidence in the record supports, and Hill–Rom points to none which could support, an inference that the transfer of assets was fraudulent, not made in good faith, or without sufficient consideration.

Accordingly, for the reasons stated above, the Court finds that CSI does not fall within one of the four exceptions to nonliability and therefore is not liable as a successor to Hurlco.

### B. Liability of General Medical and Midmark

■ For General Medical or Midmark to be liable to Hill–Rom as subsequent successors to Hurlco, their predecessor CSI would have to be liable as a successor to Hurlco. Since the Court finds that CSI is not liable as a successor to Hurlco, the Court must

continuity of ownership.

find that General Medical and Midmark are also not liable as successors.

## Duty To Warn

■ Hill–Rom espouses another possible theory as to Midmark's potential liability: duty to warn. A successor corporation's duty to warn has not been decided by the District of Columbia or Maryland courts. However, in *Nissen,* the Maryland Court of Appeals did note that "several courts, which otherwise adhere to the traditional rule of nonliability of successor corporations, have held that '[a] successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention. This is so despite the nature of the transfer.'" *Nissen,* 594 A.2d at 570 n. 3 (quoting L. Frumer & M. Friedman, *supra,* at § 2.06[5], at 2–195). The *Nissen* court cites *Shane v. Hobam* which outlined several factors affecting the establishment of a duty to warn its predecessor's customers: "'if it profits from the predecessor's good will, represents itself as the same enterprise, undertakes certain positive responsibilities of the predecessor such as servicing, and has actual or constructive knowledge of the existence of a defect.'" *Nissen,* 594 A.2d at 570 n. 3 (quoting *Shane v. Hobam,* 332 F.Supp. 526 (E.D.Pa.1971)). Several other courts have recognized similar factors, noting that a duty exists only if there is a relationship between the successor and the customer. *See LaFountain v. Webb Indus. Corp.,* 951 F.2d 544, 548–49 (3rd Cir. 1991) (applying Pennsylvania law); *Florom v. Elliott Mfg.,* 867 F.2d 570, 577 (10th Cir.1989) (applying Colorado law); *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 177 (5th Cir.1985) (applying Mississippi law); *Tucker v. Paxson Mach. Co.,* 645 F.2d 620, 626 (8th Cir.1981) (applying Missouri law); *Gee v. Tenneco, Inc.,* 615 F.2d 857, 866 (9th Cir.1980) (applying California law); *Travis v. Harris Corp.,* 565 F.2d 443, 449 (7th Cir.1977) (applying Ohio and Indiana law); *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 442 (7th Cir.1977) (applying Wisconsin law). In each of these cases, the courts found a duty owed to the user of the product, but did not address the existence of a duty to the predecessor manufacturer or its distributor. Therefore, it is not settled whether a duty is owed to a predecessor's distributor such as Hill–Rom. Nevertheless, the Court does not reach this issue, but instead assumes that such a duty exists, and finds no breach of that duty.

■ According to Hill–Rom's recitation of the facts, no child was injured in a Hurlco–type crib until July of 1983, when a child died after his head became entrapped between the canopy top and the side rail. That particular crib had been manufactured by General Medical. At the time, however, Midmark was the manufacturer of the cribs and the Food and Drug Administration first notified Midmark of the death. In response, Midmark developed a Product Recall/Field Modification, described as a retrofit kit. The kit consisted of substitute latches for the top, a warning decal to be placed on the crib top, and an operations manual. It sent these kits to its customers and notified prior manufacturers/distributors of the availability of the kits. Midmark also sent kits to Walter Reed, even though it was not one of Midmark's customers.[6] Hill–Rom, CSI, and General Medical purchased retrofit kits from Midmark and sent them to their respective customers. Specifically, Hill–Rom ordered 250 retrofit kits on April 2, 1984, and on May 18, 1984, sent 13 retrofit kits to Walter Reed for the 13 cribs that it had sold to Walter Reed in 1976. For five years, until the incident involved in this case, no child was injured in a Hurlco-type

**6.** Hill–Rom takes two contradictory positions on this fact. In its motion for partial summary judgment on plaintiffs' punitive damages claim, Hill–Rom claims that Midmark did not send the retrofit kits "to entities which had purchased pediatric cribs from the prior manufacturers/distributors." Motion for Partial Summary Judgment, at 5. However, in its opposition to Midmark's motion for summary judgment, Hill–Rom claims that Midmark sent retrofit kits to Walter Reed even though at the time Midmark had not sold any cribs to Walter Reed. *See* Opposition to Motions for Summary Judgment of Third–Party Defendants, at 57. Although the exhibits to which Hill–Rom refers in support of this point are ambiguous, the Court accepts the latter version of the facts for the purpose of this motion.

crib. However, the crib involved here was not retrofitted.

Hill–Rom bases its failure to warn claim on the fact that subsequent to the 1983–1984 retrofit, Midmark modified the crib again without notifying Hill–Rom. In 1985, a registered nurse suggested to Midmark that it provide a spring for the crib top so that the crib top would automatically open if not properly latched. Midmark produced a second retrofit and shipped it to all of its customers in August of 1986. However, it did not notify Hill–Rom of this retrofit, nor supply it to Walter Reed. Hill–Rom claims that this failure breached Midmark's duty to warn. The Court disagrees and, assuming Midmark owed a duty to Hill–Rom, finds that Midmark satisfied its duty to warn.

Midmark fulfilled its duty to warn Hill–Rom by notifying it of the death of the baby in 1983 and of the first retrofit kit. At that time, Hill–Rom was then on notice that the product it had distributed was potentially hazardous. Hill–Rom could have removed its product from the market, designed its own retrofit, or provided its customers with Midmark's retrofit. It chose the third option. According to Hill–Rom, no baby has been harmed by a crib equipped with the first retrofit kit. *See* Hill–Rom's Statement of Material Facts As To Which There Is No Genuine Issue, at ¶ 17 (attached to Hill–Rom's Motion for Partial Summary Judgment). Given this fact, nothing happened to trigger a duty on the part of Midmark to again warn Hill–Rom or to notify it of the second retrofit. Although perhaps it would have been preferable for Midmark to have informed Hill–Rom of the second modification, the Court finds that it was under no legal duty to do so. Accordingly, Midmark's motion for summary judgment on Hill–Rom's duty to warn claim is granted.[7]

### CSI's Potential Liability as Manufacturer of the Crib Top

Finally, Hill–Rom also contends that there is a genuine issue of material fact as to whether CSI, as opposed to Hill–Rom, manufactured the canopy top to the crib in which Lindsey was injured. The top, unlike the crib which bears a Hill–Rom serial number and label, bears no identifying marks. Through discovery, the parties have determined that the top was manufactured prior to April of 1979. At that time, CSI had been manufacturing cribs and tops for over a year. Therefore, either Hill–Rom or CSI sold the crib top to Walter Reed. Hill–Rom points to evidence in the record that CSI engaged in at least one sale to Walter Reed prior to April of 1979. This evidence tends to show that only security top panels to the cribs were sold, as opposed to crib tops themselves. The parties agree that if CSI only sold panels, then it would not be liable. *However*, if it sold tops to Walter Reed, CSI faces potential liability for indemnification or contribution. Although the evidence to support Hill–Rom's version of the facts is tenuous, the Court finds that a genuine issue of fact exists for trial. Therefore, the Court denies the motion for summary judgment by CSI as to this issue, without prejudice to a motion for a directed verdict if the evidence developed at trial is not sufficient to allow a reasonable jury to conclude that CSI manufactured the top at issue.

### Plaintiffs' Motion for a Separate Trial

Plaintiffs request the Court to sever the third-party claims from the case involving plaintiffs, Hill–Rom, and the United States pursuant to Rule 42(b). *See* Fed.R.Civ.P. 42(b). Plaintiffs primarily base this motion on the nature of the third-party claims, which are "commercial and contractual" claims rather than negligence and strict liability claims. Plaintiffs are concerned these claims may cause prejudice to plaintiffs by lengthening the trial and confusing the jury. Hill–Rom and third-party defendants oppose the motion for severance, ar-

---

**7.** Although Hill–Rom's opposition addresses only Midmark's duty to warn and the Court interprets Hill–Rom's brief to assert this claim only against Midmark, General Medical and CSI addressed this issue in their motions for summary judgment as well. Assuming such a duty applied to General Medical and CSI, there is no evidence to support a claim against them for breach.

guing that severance will promote neither judicial economy nor convenience. The United States' response to plaintiffs' motion argues that it is premature due to the pendency of the dispositive motions addressed above.

The decision to sever lies in the sound discretion of the Court. *See United States v. Bridgeman,* 523 F.2d 1099, 1107 (D.C.Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206, 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976). Given the Court's rulings on the motions for summary judgment, the Court finds that severance is inappropriate in this case. The only third-party claims remaining are the cross-claims between Hill–Rom and the United States, which would not be severed under plaintiffs' motion, and the claim by Hill–Rom against CSI alleging that CSI manufactured the crib top. Unlike the successor liability claims, these remaining claims do not involve the potentially complicated contractual issues about which plaintiffs express concern. Therefore, the Court finds that severance is not in the interests of convenience or judicial economy, and is not necessary to avoid prejudice. Accordingly, the Court denies plaintiffs' motion to sever.

*Conclusion*

For the reasons stated, the Court grants Hill–Rom's motion for partial summary judgment as to the issue of punitive damages. The Court also grants CSI's, General Medical's, and Midmark's respective motions for summary judgment as to the issue of successor liability. In addition, the Court grants Midmark's motion for summary judgment on Hill–Rom's duty to warn claim. However, finding a genuine issue of material fact, the Court denies CSI's summary judgment motion as it relates to the question of whether CSI or Hill–Rom manufactured the crib top at issue in this case. Finally, the Court denies plaintiffs' motion for severance. An appropriate Order accompanies this Opinion.

### ORDER

For the reasons stated in the Court's accompanying Opinion, it hereby is

ORDERED, that Hillenbrand and Hill–Rom's motion for partial summary judgment as to punitive damages is granted. Therefore, plaintiffs' claim for punitive damages is dismissed. It hereby further is

ORDERED, that General Medical and General Medical Manufacturing's motion for summary judgment is granted. Therefore, the third-party claim against General Medical and General Medical Manufacturing is dismissed. It hereby further is

ORDERED, that Midmark's motion for summary judgment is granted. Therefore, the third-party claim against Midmark is dismissed. It hereby further is

ORDERED, that CSI's motion for summary judgment is granted in part and denied in part. It hereby further is

ORDERED, that CSI's motion for summary judgment is granted as to the issue of successor liability. Therefore, Hill–Rom's successor liability claim against CSI is dismissed. It hereby further is

ORDERED, that CSI's motion for summary judgment on the issue of whether it is liable for indemnification or contribution as the manufacturer of the crib top is denied. It hereby further is

ORDERED, that plaintiffs' motion for a separate trial is denied.

SO ORDERED.